CARELLA, BYRNE, CECCHI, OLSTEIN,
BRODY & AGNELLO, P.C.
JAMES E. CECCHI
5 Becker Farm Road
Roseland, NJ  07068
Telephone: (973) 994-1700

KOREIN TILLERY PC
CHRISTOPHER M. BURKE
WALTER NOSS
YIFAN (KATE) LV
707 Broadway, Suite 1410
San Diego, CA  92101
Telephone: (619) 625-5620

KOREIN TILLERY LLC
STEPHEN TILLERY
CAROL O'KEEFE
505 North 7th Street, Suite 3600
St. Louis, MO  63101
Telephone: (314) 241-4844

*(Additional Counsel on the Signature Page)*

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| B & E ASSOCIATES, INC., on behalf of itself and all others similarly situated, | No. |
| Plaintiff, | |
| vs. | |
| FIRMENICH SA, FIRMENICH INCORPORATED, AGILEX FLAVORS & FRAGRANCES, INC., GIVAUDAN SA, GIVAUDAN FRAGRANCES CORPORATION, GIVAUDAN ROURE (UNITED STATES) INC., UNGERER & COMPANY, INC., CUSTOM ESSENCE INCORPORATED, INTERNATIONAL FLAVOR & FRAGRANCE INC., SYMRISE AG, and SYMRISE INC. | CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

NATURE OF THE ACTION ...................................................................................1

PARTIES ................................................................................................................3

JURISDICTION AND VENUE ...............................................................................9

FACTUAL ALLEGATIONS ..................................................................................10

    **A.**    **The Fragrance Market** ..................................................................10

    **B.**    **Defendants Dominate the Fragrance Market**.............................16

    **C.**    **Defendants Conspired to Fix Prices in the Fragrance Market**.......26

        1.    Defendants' Public Statements Show They Were Fixing Prices ..............27

        2.    Defendants Continued to Increase Prices Despite Easing Raw
            Materials Costs..............................................................................34

    **D.**    **"Plus Factors" in the Fragrance Market Provide Additional Evidence
        of Defendants' Unlawful Conspiracy** .................................36

    **E.**    **Governmental Investigations** ..........................................41

CLASS ACTION ALLEGATIONS .........................................................................43

ANTITRUST INJURY .........................................................................................45

FRAUDULENT CONCEALMENT.......................................................................45

CONTINUING VIOLATIONS ...............................................................................47

CLAIMS FOR RELIEF .........................................................................................47

    Violation of §§1 and 3 of the Sherman Act (15 U.S.C. §§1, 3).........................47

PRAYER FOR RELIEF .........................................................................................49

DEMAND FOR JURY TRIAL ..............................................................................50

"Odors have a power of persuasion stronger than that of words, appearances, emotions, or will.  The persuasive power of an odor cannot be fended off, it enters into us like breath into our lungs, it fills us up, imbues us totally.  There is no remedy for it . . . He who ruled scent ruled the hearts of men."[1]

Plaintiff B & E Associates, Inc. (d/b/a Keystone Candle Company), individually and on behalf of all others similarly situated, bring this class action against defendants Firmenich SA, Firmenich Incorporated, Agilex Flavors & Fragrance, Inc. (collectively, "Firmenich"), Givaudan SA, Givaudan Fragrances Corporation, Givaudan Roure (United States) Inc., Ungerer & Company, Inc., Custom Essence Incorporated (collectively, "Givaudan"), and International Flavors & Fragrances, Inc. ("IFF"), and Symrise AG, Symrise Inc. (collectively, "Symrise," and with Firmenich, Givaudan, IFF, collectively, "Defendants").  Plaintiff seeks treble damages, injunctive relief, and other relief, for Defendants' *per se* violations of the §1 of the Sherman Act, 15 U.S. §1, and allege, based on personal knowledge as to the facts pertaining to itself, on the investigation of counsel, and on information and belief for all other allegations, as follows.

## NATURE OF THE ACTION

1.      This action arises from Defendants' conspiracy to fix, raise, maintain, and stabilize the prices for "Fragrances" (as defined below) sold in the United States from January 1, 2018 to present (the "Class Period").

2.      Smell is a powerful sense.  You cannot see, hear, feel, or taste it, yet how something smells affects and amplifies the other senses.  Smell can influence emotions, evoke memories, and

---

[1]  Patrick Süskind, *Perfume: the Story of a Murderer*.

1

trigger nostalgia, "the suffering caused by an unappeased yearning to return."[2]  It is a powerful and long-lasting sense.  The way something smells lingers in our memories far longer and more vividly than how the same thing appears or sounds.  It is fundamental to how we understand the spiritual and corporeal.  Scent ("aroma" in the Old Testament) is used in religious rituals to convey the solemnity of the sacred.  Scent is fundamental to sexual attraction as songs and odes attest.[3]  It is, therefore, not surprising that the history of human beings' manipulation of scent reaches back a millennia.

3.      Companies, such as Plaintiff, add Fragrance (scent) to consumer goods to make those products smell pleasant and establish the products' signature in the marketplace.  A product's smell helps establish customer preference by influencing the end user's overall enjoyment of a product and by establishing a positive olfactory (and emotional) association with the product.  Smell is one of the most important drivers of consumer purchase and repurchase decisions and is therefore a key fixed input cost for consumer goods manufacturers, like Plaintiff and the class.  In short, companies use the power of smell to brand and sell their products because it works.

4.      Defendants are the world's largest suppliers of Fragrances.  They manufacture, market, and sell Fragrances throughout the world.  Throughout the Class Period, Defendants sold Fragrances directly to Plaintiff and the class in the United States.

5.      Beginning at least as early as January 1, 2018, the exact dates being currently unknown, Defendants entered into an unlawful agreement to increase Fragrance prices charged to

---

[2]  Milan Kundera, *Ignorance*.

[3]  Moukakou, K. (2023) "*I seek new perfumes, ampler blossoms, untried pleasures.*"~ *Joris-Karl Huysmans*          *pic.twitter.com/uqAMiI07O2,*          *Twitter*, https://twitter.com/princessekateri/status/1641813212847919106.

Plaintiff and the class.  Defendants' conspiracy to fix prices for Fragrances began in response to increased costs of the raw materials needed to manufacture Fragrances.  To protect their profitability, Defendants secretly coordinated with each other on their pricing policy for customers, allocated certain customers, and coordinated supply restraints for Fragrances.  Through their unlawful coordination, Defendants imposed supracompetitive prices on customers, like Plaintiff and the class, without fear of losing market share.

6.     On March 7, 2023, the U.S. Department of Justice's Antitrust Division, the U.K.'s Competition and Markets Authority, and the European Commission's DG COMP coordinated dawn raids on the Defendants' facilities.  On March 8, 2023, the Swiss competition authority COMCO announced that it had indications that Firmenich International SA (Geneva), Givaudan SA (Geneva), International Flavors & Fragrances Inc. (USA), and Symrise AG (Germany) violated cartel law.  According to COMCO, "There are suspicions that these undertakings have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances."  Defendants' horizontal conspiracy to fix prices, rig bids, or allocate markets is a *per se* unlawful restraint of trade under §§1 and 3 of the Sherman Act.  As a result of the conspiracy, Plaintiff and the class have been injured in their businesses by paying artificially inflated prices for Fragrances directly to Defendants.  Plaintiff brings this class action for relief under the Sherman Act on behalf of all persons in the United States and its territories who directly purchased Fragrances from one or more Defendants and/or entities owned or controlled by them during the Class Period.

## PARTIES

**Plaintiff**

7.     Plaintiff B & E Associates, Inc. (d/b/a Keystone Candle Company) is a Pennsylvania corporation with its principal place of business located at 7241 Paxton Street,

Harrisburg, Pennsylvania 17111. During the Class Period, Plaintiff B & E Associates, Inc. purchased Fragrances directly from one or more Defendants. As a consequence of the conduct described in this Complaint, Plaintiff B & E Associates, Inc. and class members suffered damages in that they paid more for their purchases of Fragrances than they would have in the absence of the violations of law alleged herein.

**Defendants**

8.  **The Firmenich Defendants**: Defendant Firmenich SA is a privately owned Switzerland corporation with its principal place of business located at Rue de la Bergere 7, Satigny CH-1242, Switzerland. Firmenich SA describes itself as the world's largest private Fragrance and flavor[4] company and is involved in the research, creation, manufacture, and sales of perfumes, flavors, and ingredients, including those used in manufacturing consumer goods.[5] Firmenich SA operates 46 manufacturing plants and six research and development centers globally.[6] Firmenich SA holds itself out as having offices throughout the United States, some of which may be wholly owned subsidiaries of Firmenich SA. Firmenich SA is set to complete a merger with Royal DSM

---

[4]  Flavors, similar to Fragrances, are additives that give food and other consumables a specific taste. Given their similarities, Defendants manufacture both Fragrances and flavors; however, at present, this action only concerns Fragrances.

[5]  Press Release: Firmenich Launches Focus Powered by EmotiCODE™, Nov. 30, 2022, https://www.firmenich.com/fragrance/press-release/firmenich-launches-focus-powered-emoticodetm.

[6]  Firmenich ESG Report 2022, at 4, https://www.firmenich.com/sites/default/files/ESGReport_FY22.pdf.

NV in 2023.  Analysts have estimated that the combined entity will become the largest Fragrance, beauty, well-being, and nutrition supplier in the world.[7]

9.      Defendant Firmenich Incorporated ("Firmenich U.S.") is a Delaware corporation with a principal place of business located at 250 Plainsboro Road, Plainsboro, NJ 08536. Firmenich U.S. is the primary U.S. subsidiary of Firmenich SA and is responsible for Firmenich's U.S.-based operations, including the research and development of Fragrances, aromatic chemicals, and natural and artificial flavors, and supplies its products to customers in the United States. Firmenich U.S.'s Fragrance manufacturing business operates in, *inter alia*, Plainsboro, New Jersey and Somerset, New Jersey.  Firmenich U.S.'s Fragrance sales are conducted across several hubs, including through offices in Plainsboro, New Jersey.

10.      Defendant Agilex Flavors & Fragrances, Inc. ("Agilex") is a Delaware corporation with its principal place of business located at 140 Centennial Ave. #100, Piscataway, NJ 08854. Agilex manufactures Fragrance products and delivery systems for air care, home care, and personal care, as well as for industrial use.  Firmenich SA acquired Agilex in 2017, and since then has operated it as a wholly-owned subsidiary.

11.      Where Plaintiff ascribes an action to "Firmenich," including through the defined term "Defendant," unless stated otherwise, the action is alleged to have been taken by Firmenich U.S. as the U.S. operating entity of the Firmenich single enterprise.  However, allegations as to "Firmenich's" participation in the continuing agreement, understanding, and conspiracy alleged herein are directed to all named Firmenich Defendants.

---

[7] Andy Hoffman, Thomas Mulier and Dinesh Nair,  *DSM Forms Flavor Giant With $21 Billion Deal for Firmenich*, Bloomberg (May 31, 2022), https://www.bloomberg.com/news/articles/2022-05-31/royal-dsm-agrees-to-merge-with-swiss-fragrance-maker-firmenich.

12. **The Givaudan Defendants**: Defendant Givaudan SA is a Switzerland corporation with its principal place of business located at Chemin de la Parfumerie 5 Vernier, Genève, 1214 Switzerland. Givaudan is currently the largest multinational manufacturer of Fragrances. Givaudan SA's Fragrance & Beauty business develops and sells Fragrances for, among other things, consumer products. Givaudan SA operates in 166 locations worldwide, with 78 production sites.[8] Givaudan SA's Fragrance businesses have offices throughout the United States, including in East Hanover, Mount Olive, Towaco, Lincoln Park, and Somerset, New Jersey. Givaudan SA's Fragrance manufacturing business operates in, *inter alia*, New Jersey. Givaudan's Fragrance business and sales activities in the United States take place in, *inter alia*, New Jersey.

13. Defendant Givaudan Fragrances Corporation ("Givaudan U.S.") is a Delaware corporation with its principal place of business located at 1199 Edison Dr. 1-2, Cincinnati, OH, 45216-2265. Givaudan U.S. is the primary U.S. operating subsidiary of Givaudan SA. Givaudan U.S. conducts business in several locations in the United States, including a major hub located at 300 Waterloo Valley Road, Mount Olive, NJ 07828. Givaudan U.S. carries out Fragrance-related business, sales, manufacturing, and creation and research activities in the United States.

14. Defendant Givaudan Roure (United States) Inc. ("Givaudan Roure") is a Delaware corporation with its principal place of business at 1199 Edison Dr. 1-2, Cincinnati, OH, 45216-2265. Givaudan Roure is a U.S. subsidiary of Givaudan SA and manufacturers and sells Fragrance inputs, including synthetics.

15. Defendant Ungerer & Company, Inc. ("Ungerer") is a Delaware corporation with its principal place of business located at 4 Ungerer Way, Lincoln, Park, NJ 07035. Ungerer and

---

[8] Givaudan, Our Global Presence, https://www.givaudan.com/our-company/about-givaudan/our-global-presence.

its related companies are U.S.-based Fragrance developers and suppliers that focus predominantly on natural ingredients for Fragrance and flavor creation, as well as for end customers of such specialties.[9]  Givaudan SA acquired Ungerer in 2020, and since then has operated it as wholly-owned subsidiary.[10]

16.    Defendant Custom Essence Incorporated ("Custom Essence") is a New Jersey corporation with its principal place of business located at 53 Veronica Ave., Somerset, NJ 00873. Custom Essence specializes in the formulation of natural Fragrance and creates perfumes across categories for both local and regional and for larger customers.  Givaudan SA acquired Custom Essence in 2021, and since then has operated it as a wholly-owned subsidiary.[11]

17.    Where Plaintiff ascribes an action to "Givaudan," including through the defined term "Defendant," unless stated otherwise, the action is alleged to have been taken by Givaudan U.S. as the U.S. operating entity of the Givaudan single enterprise.  However, allegations as to "Givaudan's" participation in the continuing agreement, understanding and conspiracy alleged herein are directed to all named Givaudan Defendants.

18.    **Defendant IFF**:  Defendant IFF International Flavors & Fragrances, Inc. ("IFF") is a New York corporation with its principal place of business located at 521 West 57th Street, New York, NY 10019.  IFF claims to be "a leading creator and manufacturer of food, beverage, health & biosciences, scent and pharma solutions and complementary adjacent products, including

---

[9]  Givaudan completes acquisition of Ungerer (Feb. 20, 2020) Givaudan, https://www.givaudan.com/media/media-releases/2020/givaudan-completes-acquisition-ungerer.

[10]  *Id*.

[11]  Givaudan completes the acquisition of Custom Essence (Dec. 3, 2021) Givaudan, https://www.givaudan.com/media/media-releases/2021/givaudan-completes-acquisition-custom-essence.

cosmetic active and natural health ingredients, which are used in a wide variety of consumer products."[12]  IFF's "scent" business creates and manufactures Fragrances and cosmetic ingredients that are used in fine perfumes and household and personal care products.  IFF has approximately 210 facilities, creative centers, and application laboratories located in approximately 45 different countries, including the United States.  IFF's research and development activities are located in, among other places, Union Beach, New Jersey.  IFF's sales operations in the United States are conducted in, among other places, 150 Docks Corner Rd., Dayton, NJ 00810.

19.      **The Symrise Defendants**:  Defendant Symrise AG is a Germany stock corporation with its principal place of business located at Mühlenfeldstrasse 137603 Holzminden, Germany. Symrise AG develops, produces, and sells Fragrances, flavoring and food ingredients, cosmetic active ingredients, and raw materials as well as functional ingredients and solutions that are intended to enhance the sensory properties and nutrition of various products.  According to its website, Symrise operates in more than 100 locations across the globe.[13]  Symrise AG's Fragrance business has offices in locations throughout the United States, including: Teterboro, New Jersey; New York, New York; Mondovi, Wisconsin; and Hodges, South Carolina.  Symrise AG's Fragrance business and sales activities in the United States take place at, *inter alia*, at 505 Park Ave., Fl. 15, New York, NY 10022 and 300 North St., Teterboro, NJ 07608.

20.      Defendant Symrise Inc. ("Symrise U.S.") is a New Jersey corporation and the primary U.S. operating subsidiary of Symrise AG with a principal place of business located at 300

---

[12]  IFF, 2021 Form 10 - k, https://www.sec.gov/Archives/edgar/data/51253/00000512532200000 7/iff-20211231.htm.

[13]  Symrise, Global Locations, https://www.symrise.com/our-company/global-locations.

North St., Teterboro, NJ 07608. Symrise U.S. carries out Fragrance-related business, sales, and activities in the United States.

21.     Where Plaintiff ascribes an action to "Symrise," including through the defined term "Defendant," unless stated otherwise the action is alleged to have been taken by Symrise U.S. as the U.S. operating entity of the Symrise single enterprise.  However, allegations as to "Symrise's" participation in the continuing agreement, understanding, and conspiracy alleged herein are directed to both Symrise AG and Symrise U.S.

22.     During the Class Period, each Defendant sold Fragrance in the United States and in this District.

23.     Each Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

24.     Where Plaintiff ascribes an action to "Defendants," unless stated otherwise, the action is alleged to have been taken by each of Firmenich, Givaudan, IFF, and Symrise Defendant.

## JURISDICTION AND VENUE

25.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26) to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for injuries sustained by Plaintiff and the members of the class by virtue of Defendants' violations of §§1 and 3 of the Sherman Act, and to enjoin further violations.

26.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C §§1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

27.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured products throughout the United States, including in this District; (c) sold Fragrances

throughout the United States, including in this District; (d) had sufficient minimum contacts with the United States, including in this District; and/or (e) engaged in anticompetitive conduct that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

28.     Venue is proper in this District pursuant to §§4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26 and 28 U.S.C. §1391(b), (c), and (d), because, at all relevant times, one or more of the Defendants reside or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

29.     Defendants' activities, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## FACTUAL ALLEGATIONS

### A.     The Fragrance Market

30.     Each day people in the United States smell a product before they buy it.  It is one way in which they test the product.  Smell becomes one of the ways people identify products.  This is particularly true for consumer products including, for example, body wash, soap, shaving gel, aftershave, household cleaners, candles, dryer sheets, fabric softeners, and laundry detergent, which are manufactured by class members.

31.     Consumer goods get their smells from chemical ingredients and/or compounds or, sometimes, as an aroma compound, and odorant, aroma, scent – which are additives that have a smell or odor (collectively, "Fragrances").  The role of a Fragrance is to impart a pleasant order to

10

the finished product and deliver a pleasant experience to the end user.  Fragrances are also used to disguise disfavored smells in the product.

32.     How a product smells – or its fragrance in industry parlance – is a key driver of consumer preference both at the point of purchase and throughout its use.  A product's smell helps establish customer preferences by influencing the customer's overall enjoyment of a product and developing a positive olfactory association with the product.  Smell also cues customers to a product's attributes and functional benefits – for example, consumers tend to associate a "lemony" smell with a product's ability to clean effectively.  A lavender smell may evoke relaxation, and a leather smell may signal richness or status.

33.     Empirical research shows that olfaction is deeply involved in psychological and physiological conditions that impact and inform consumer decision-making.[14]  Well-known author and brand consultant, Martin Lindstrom, conducted a study which indicted that scents trigger as much as 75% of human emotions related to memory, and that brand impact increased by 30% when more than one sense is engaged and by 70% when three senses are integrated into the brand message.[15]

34.     It is not surprising then that Nicolas Mirzayantz, IFF's Division CEO of Scent, stated on April 15, 2021, that "scent continues to be the #1 attribute driving purchase intent and

---

[14]  *Herz, R.S. et al.* (2022) "*A three-factor benefits framework for understanding consumer preference for scented household products: Psychological interactions and implications for future development,*" *Cognitive Research: Principles and Implications*, Springer International Publishing, https://doi.org/10.1186/s41235-022-00378-6.

[15]  *How To Build A Brand Or Product Using The Power Of Fragrance* (2017) Alpha Aromatics, https://www.alphaaromatics.com/blog/building-a-brand-using-fragrance.

even more importantly, the purchase repeat factor."[16]  As a result of the critical importance of Fragrances to customer purchases – *i.e.*, the ability of a product's smell to drive sales for that product – Fragrances are indispensable to consumer goods manufacturers like Plaintiff and the class.

35.    Manufacturers of consumer goods, like Plaintiff and the class, generally do not make their own Fragrances.  Instead, they purchase Fragrances from third-party Fragrance manufacturers, principally Defendants, for incorporation into goods like soap, shampoo, house-cleaning products, detergents, dryer sheets, aftershave, cosmetics, and many other products used every day.  Fragrances are even incorporated into certain products labelled "unscented" because the manufacturer may need to add just enough Fragrance to mask the unpleasant smell of other ingredients, without giving the product a distinct scent.

36.    The physical production of Fragrances occurs at different facilities around the world, including in the United States.  The U.S. Fragrances production occurs predominantly in New Jersey.  For example, Givaudan manufactures Fragrances in Mount Olive, New Jersey, IFF in Hazlet, New Jersey, Firmenich in Princeton, New Jersey, and Symrise in Teterboro, New Jersey. Defendants also sell to customers (like Plaintiff and the class) Fragrances manufactured in Defendants' plants overseas, for the purpose of manufacturing consumers goods in the United States.

37.    Fragrance suppliers, including Defendants, typically engage in the creation and production of: (1) fragrance ingredients; (2) fragrance compounds; and (3) other miscellaneous

---

[16]  International Flavors & Fragrances Inc. Scent Learning Lab, Edited Transcript of International Flavors & Fragrances Inc. conference call or presentation Thursday, April 5, 2021 at 10:59:00 am GMT.

fragrance-related ingredients, which are then sold to manufacturers of consumer goods. "Fragrances" include ingredients, compounds, and miscellaneous fragrance-related ingredients. Fragrance ingredients, which can be natural or synthetic, are active and functional ingredients that are used in the preparation of fragrance compounds and are also sold to other fragrance manufacturers, including competitors.  A Fragrance compound is a unique and proprietary combination of multiple fragrance ingredients.  Fragrance compounds are typically the additives used by Plaintiff and the class during the manufacturing process of the consumer product.  Lastly, miscellaneous Fragrance-related ingredients are other ingredients that have fragrance functionalities but serve multiple purposes (*e.g.*, an active ingredient that has a separate specific purpose but also smells nice).

38.     The Fragrance market is worth billions of dollars yearly.  Annual sales of Fragrance ingredients were valued at $9.1 billion in 2022.[17]  Annual sales of Fragrance compounds were valued at $35.08 billion in 2021.[18]  In the United States, revenues in the Fragrance market are estimated to reach $8.71 billion in 2023.[19]

---

[17]   Ltd, R. and M. (2023) *Fragrance Ingredients Market: Global industry trends, share, size, growth, opportunity and forecast 2023-2028, Research and Markets – Market Research Reports – Welcome*, https://www.researchandmarkets.com/reports/5732797/fragrance-ingredients-market-global-industry.

[18]   Research and Markets (2022) *Global Fragrance Market Report to 2027 - accelerating e-commerce channels and increasing demand for hygiene products are driving growth, GlobeNewswire News Room. Research and Markets*, https://www.globenewswire.com/en/news- release/2022/11/10/2552774/28124/en/Global-Fragrance-Market-Report-to-2027-Accelerating-E-Commerce-Channels-and-Increasing-Demand-for-Hygiene-Products-are-Driving-Growth.html.

[19]   Statista, Fragrances – United States, https://www.statista.com/outlook/cmo/beauty-personal-care/fragrances/united-states.

39.     Fragrance manufacturing involves collecting ingredients, extracting oils, blending, aging, and quality control.  This process includes natural ingredients that produce oil (*e.g.*, flowers, fruit, leaves), synthetic chemicals (to re-create the smells of non-oily substances or smells not found in nature), and other sources, like alcohol, coal, and coal tars. More than 95% of the chemicals in synthetic fragrances are derived from petrochemicals, such as phthalates, synthetic musks, parabens, and benzene derivatives.[20]  Many of these chemicals have been linked to negative health and environmental outcomes and, as a result, there has been growing consumer-driven movement towards "clean" products that contain natural ingredients and exclude petrochemicals.

40.     At bottom, Fragrance manufacturing involves the extraction of oils from natural ingredients and the blending of the fragrance oils.  Once blended, an aging period may follow. Manufacturers, like Defendants, also employ biotechnology to utilize yeasts and enzymes to produce Fragrance ingredients.

41.     While Defendants treat their Fragrances as intellectual property, Defendants provide overlapping Fragrances. That is, Defendants sell similar smell profiles even if they market them as something unique or different.  Fragrances are, to a large extent, interchangeable.  IFF's 2021 annual report noted the fungibility of its products as a potential risk to its business. Specifically, IFF noted that "increasing [its Fragrance] prices to our customers could result in long-term sales declines or loss of market share if our customers find alternative suppliers or choose to

---

[20] "Synthetic Fragrances" (2020) https://upfrontcosmetics.ca/blogs/be-upfront/synthetic- fragrances. *Up Front Cosmetics*, 14 May, https://upfrontcosmetics.ca/blogs/be-upfront/synthetic-fragrances.

reformulate their consumer products to rely less on our products, which could have an adverse long-term impact on our results of operations."[21]

42.    In light of their overlapping and interchangeable offerings, Fragrance suppliers, including Defendants, have a large, diversified base of customers, including Plaintiff and the class which are producers of, *inter alia*, household products, personal care products, and luxury brands. For example, on August 12, 2019, IFF's CEO Franklin Clyburn confirmed that IFF serves "customers across a wide spectrum of sizes" within its "Scents" business.  Defendants also sell Fragrance ingredients to one another and other competing fragrance producers (for example, IFF sells ingredients to its competitors).[22]

43.    Furthermore, the impact of the Fragrance on the product's success in the market is disproportionally high.  As former IFF executive Nicolas Mirzayantz asserted, Fragrance is responsible for 70% of consumer repeat purchase and initial purchase decisions.[23]

---

[21] IFF, 2021 Form 10 - K, https://www.sec.gov/Archives/edgar/data/51253/000005125322000007/iff-20211231.htm.

[22]    *See* International Flavors & Fragrances Inc. at Consumer Analyst Group of New York Conference, Boca Raton Feb 27, 2018 (Thomson StreetEvents) – Edited Transcript of International Flavor & Fragrances Inc. presentation Thursday, February 22, 2018 at 8:00:00pm GMT.

[23]  International Flavors & Fragrances Inc. Scent Learning Lab, Edited Transcript of International Flavors & Fragrances Inc. conference call or presentation Thursday, April 5, 2021 at 10:59:00am GMT.  Available at: https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-.

44.     As Insight Alpha explained "[r]egular use of flavours [sic] and Fragrances in a product is no longer a luxury but a necessity for consumer acceptance."[24]   Defendants recognize this.[25]

## B.     Defendants Dominate the Fragrance Market

45.     For decades, Defendants, have dominated the Fragrance market.   The Fragrance market is highly concentrated in the hands of Defendants, who, collectively have approximately 60% of the global market.[26]   Individually, Defendants hold the following estimated shares in the global Fragrance market: Givaudan (16%), Firmenich (10%), Symrise (10%), and IFF (19%).[27] Defendants represent more than 70% of the narrower fragrance compound market.[28]   Defendants' U.S. market shares are understood to be similar to their global market shares.

46.     Defendants have also further cemented their control of the Fragrances market in recent years through the acquisition of smaller rivals and through joint ventures, both in the United

---

[24] IFF, 2021 Form 10 - K, https://www.sec.gov/Archives/edgar/data/51253/00000512532200000 7/iff-20211231.htm.

[25] Givaudan   Investor   Presentation,   July- October   2018,   p.6   (2018)   Givaudan, https://www.givaudan.com/files/121281/download.

[26] Top four fragrance groups raided in coordinated antitrust probe, FINANCIAL TIMES, https://www.ft.com/content/ebe2087e-198d-40dd-9615-e090facfb99f.

[27] Global market share of the leading flavors and fragrances manufacturers 2021, Statista. Available at:  https://www.statista.com/statistics/990255/flavors-and-fragrances-industry-global-market-share-by-manufacturer/.

[28] MarketScreener (2021) Transcript : *International Flavors & Fragrances Inc. - Special Call: Marketscreener, MarketScreener.com | stock exchange quotes| Company News*.   International Flavors   &   Fragrances   Inc.   Scent   Learning   Lab.   Available   at: https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Special-Call-37787511/.       (Last visted: April 20, 2023).

States and abroad.  For example, during the Class Period, Givaudan completed at least 15 mergers and acquisitions, including the acquisition of U.S.-based Fragrance suppliers Custom Essence in 2021 and Ungerer & Company in 2019.  At the same time, IFF completed multiple mergers, including the $26.2 billion merger with DuPont's Nutrition & Biosciences unit in 2021 and the $7.1 billion acquisition of major Fragrance competitor Frutarom in 2018.  Indeed, as part of the Frutarom acquisition,[29] IFF closed multiple Frutarom manufacturing sites, thereby reducing market capacity while also gaining market share.[30]  Symrise also acquired the Fragrance unit of another major competitor, Sentient Technologies Corporation[31] in 2020, among other Fragrance acquisitions.  Finally, Firmenich entered into about a dozen acquisition agreements or joint ventures during the Class Period, including a 2022 merger with DSM, a "merger of equals" valued at roughly $21 billion, which will create the only company "to combine flavors and fragrances with nutritional benefits" and will give Firmenich "comparable footing to IFF," after IFF's combination with DuPont.[32]

---

[29]  Prior to the acquisition, Frutarom had around the ninth largest market share in the Fragrance market.

[30]  Poinski, M. (2020) *IFF completes $26.2B merger with Dupont Unit, Food Dive.* Food Dive, https://www.fooddive.com/news/iff-on-track-to-complete-262b-merger-with-dupont-unit-in-february/588850/.

[31]  Prior to the acquisition, Sentient Technologies Corporation had around the sixth largest market share in the Fragrance market.

[32]  Oller, S. (2022) *Firmenich to merge into 'powerhouse of innovation and creativity*.'  Food Dive, https://www.fooddive.com/news/dsm-firmenich-to-merge-into-powerhouse-of-innovation-and-creativity/624759/.

47.     Defendants' dominance of the Fragrance market is also protected by certain market structures which Defendants exploit to their advantage and, as alleged below, Defendants' own anticompetitive conduct.

48.     *First*, the Fragrance market has high barriers to entry that protect incumbent producers like Defendants.  Factors that deter new entry to the Fragrances market include, but are not limited to:

- **Regulations**.  Fragrance suppliers are subject to legal and regulatory frameworks (*e.g.*, environmental, health and safety) that are geographically specific.  Large suppliers with an international presence and more robust resources have an advantage in navigating such regulations because they will have already invested in a compliance infrastructure as well as in lobbyists to influence the legal and regulatory framework.

- **Intellectual Property and Trade Secrets**.  Although a smell cannot be patented, the process for manufacturing a specific fragrance and its chemical composition constitute intellectual property and are guarded jealously by Defendants despite their purchasers' efforts to promote greater transparency to meet growing consumer demand for the same.

- **Scale**.  Defendants benefit from economies of scale, which occur when increased output leads to lower average costs.  Hopeful new entrants to the Fragrances market find it difficult to compete because their average costs would be much higher than the larger incumbents, and because they lack similar promotion recourse.  The mature and relatively saturated nature of the market also acts as a deterrent to new entrants.

- **Access to Raw Materials**.  Raw materials are sourced from all over the globe with attendant supply chain complexity.  Access to materials used as inputs is of critical importance to the ability of a firm to enter the market.  Defendants, as the largest suppliers, maintain substantial control over access to key ingredients because they produce those ingredients themselves.  Defendants also sell Fragrance ingredients to each other but limit the sale of these materials to new entrants and smaller competitors.

- **Global Footprint**.  Fragrance customers are typically multinational and require the global manufacturing and distribution capabilities of their Fragrance suppliers, who often manufacture the same product, or similar products, in multiple locations across the globe to supply local markets.  New entrants typically do not have the requisite cross-border reach to win requests for proposal that require the supply of the same fragrance to multiple locations globally.

• **Core Supplier Lists**.   Large multinational customers – who are Defendants' key clients in terms of purchasing volume – purchase from a short list of core suppliers.  Core Fragrance suppliers are formally selected to work as a preferred partner on a given product line for a duration from three to four years, effectively freezing out smaller, untested new suppliers.  On April 15, 2021, Mr. Mirzayantz described the qualification process to be selected to be on a core supplier list as analogous to competing for the "Olympics."[33]

• **High Capital Requirements**.  Only a few Fragrance companies have the skills, capacity, and resources to manufacture Fragrances.  The amount of research and development, marketing, and capital expenditure required to enter this industry and gain market share has limited the number of industry operators.  To gain market share, companies spend large sums of money on marketing and to acquire competitors.  New entrants must overcome the need for substantial financing.

49.    Indeed, Defendants IFF and Givaudan have repeatedly touted to their investors that the Fragrance market is protected by high barriers to entry.  Givaudan listed the industry's "high barrier to entry (complexity, R&D, consumer insight, regulations, etc.)" as a key investment highlight in a 2022 investor presentation.[34]  Givaudan's Chief Financial Officer, Alison Cornell, boasted during the Deutsche Bank Global Consumer Conference on June 14, 2016, "the barriers to entry favor the large players, as they include an increasing global (technical difficulty) regulatory environment; the need for capital investment in manufacturing facilities; the significant and ongoing investment in research and development; the complexity of managing global customers; and ongoing investment in ingredients, people, intellectual property, and processes."[35]

---

[33]  MarketScreener (2021) Transcript: *International Flavors & Fragrances Inc. - Special Call: Marketscreener, MarketScreener.com | stock exchange quotes| Company News*.  International Flavors & Fragrances Inc. Scent Learning Lab., https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Special-Call-37787511/.

[34]  2022 Investor Presentation (2022) Givaudan, https://www.givaudan.com/files/giv-2022-investor-presentation_jan.pdf.

[35]    Zonebourse (2016) Transcript: *International Flavor & Fragrances Inc. Presents at Deutsche Bank Global Consumer Conference*, https://www.zonebourse.com/cours/ac

Symrise gave a similar presentation to its investors in 2019, stating high barriers to entry included "core list system and increasing regulatory pressure."[36]

50.     In a 2018 article, merger and acquisition advisory firm Grace Matthews, reiterated that barriers to entry in Fragrances and flavors are high, as "technical expertise is highly valued, and regulatory compliance can be a significant issue as many products made by the F&F industry come into contact with the human body."[37]  Marifaith Hackett, Director of Specialty Chemicals with IHS Markit, explained, "the business is fairly opaque to outsiders – by design, no doubt – and any new entrant to the F&F industry would have to expect a fairly sharp learning curve" and "[n]ew entrants tend to start out small."[38]  The author of the article added, "[t]hese new entrants are often founded by individuals with pre-existing knowledge and contacts in the industry."[39]

51.     *Second*, Defendants are vertically integrated to varying degrees.  This means that Defendants control several stages of Fragrance production, including the sourcing of raw materials, manufacturing, and distribution.  Most notable, Defendants source or produce their own Fragrance ingredients and use these ingredients during the manufacturing process to create Fragrance compounds, making themselves significantly less dependent on third parties for key

---

tion/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Deutsche-Bank-Global-Consumer-Confe-38010620/.

[36] *2019 Investor Presentation* (2019) Symrise,   https://www.symrise.com/fileadmin/symrise/Cor porate/Investors/Financial_calendar_and_presentations/190611_Symrise_Investor_Presentation_ Paris.pdf.

[37] Valk, V. (2018) *High valuations do not stop flavors and fragrances deals*, at 2. Chemical Week, https://gracematthews.com/wp-content/uploads/2021/11/Highvaluationsdonotstopflavorsandfragrancesdeals.pdf.

[38] *Id.*

[39] *Id.*

inputs.  Indeed, Defendants describe their vertical integration as a strategic advantage.  For example, in connection with an acquisition, Givaudan boasted that additional vertical integration would "enhance our industry leadership."[40]  IFF boasted that its vertical integration in bioscience "will be a key driver of our innovation platform,"[41] and Firmenich described its "unmatched vertically integrated portfolio" as a "unique value proposition."[42]  Robust vertical integration, like Defendants' operations here, creates and reflects significant market power by alleviating sourcing issues, driving greater efficiencies, reducing costs, and allowing for more control along the manufacturing or distribution process.  As a result, vertical integration reinforces barriers to entry into the Fragrance market because prospective or smaller competitors cannot compete with the efficiencies and scale of Defendants.

52.    *Third*, notwithstanding the fact that many fragrance products are commodities at the point of selection, the Fragrances market is characterized by the presence of particularly high switching costs.  Changing a product's Fragrance requires the manufacturers to undergo several steps, including obtaining regulatory approval and conducting consumer testing to make sure the

---

[40] Givaudan completes acquisition of Ungerer, Givaudan, https://www.givaudan.com/file/207451/download.

[41] Zonebourse (2021) Transcript:  *International Flavor & Fragrance Inc. Presents at Barclays Global Consumer Staples Conference* (Virtual), https://www.zonebourse.com/cours/action/INTERNATIONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Barclays-Global-Consumer-Staples-Co-37765129/.

[42] Firmenich Appoints New Leadership for Integrated Perfumery & Ingredients Organization (2023) Firmenich, https://www.firmenich.com/fragrance/press-release/firmenich-appoints-new-leadership-integrated-perfumery-ingredients.

new Fragrance receives consumer acceptance.[43]   These switching costs are also a significant barrier to entry for new players because customers are hesitant to change from established manufacturers, like Defendants, to cheaper, but unproven, alternatives.

53.     Finally, Defendants control the most important and powerful trade organizational and self-regulating bodies in the Fragrance market.

54.     To start, Defendants belong to the International Fragrance Association ("IFRA"), an official self-regulatory representative body of the worldwide fragrance industry worldwide with the stated goal of promoting the safe use of fragrances.  IFRA is currently limited to seven regular members: the Defendants, Robertet Groupe, Takasago International Corporation, and BASF.  In addition to the seven regular members, IFRA also counts among its members a number of National Associations that represent companies in 24 countries.  The Defendants have influential representatives on IFRA's board, including Symrise's Chief Sustainability Officer, Hans Holger Gliewe, who has been the chair of IFRA since April of 2020.  Prior to Mr. Gliewe, Michael Carlos, previously President of Givaudan's Fragrance Division and currently a board member of Givaudan, served as chair of IFRA from 2015 to 2020.  Every year, IFRA hosts the Global Fragrance Summit, which is a multi-day event dedicated to discussing the political, economic, scientific, and regulatory trends affecting the fragrance industry.[44]  IFRA also hold other events throughout the year for its members (including Defendants).  Through such events, Defendants have ample opportunity to meet and coordinate.  Indeed, the 2022 IFRA Global Fragrance Summit

---

[43]  *Chemical Insights*, Grace Matthews, (Summer 2018), at 2, https://gracematthews.com/wp-content/uploads/2021/10/ChemicalNewsletter-Summer2018-1.pdf.  (Last visited:  April 20, 2023).

[44]  IFRA,Dialogue, The International Fragrance Assn.  Available at:   https://ifrafragrance.org/priorities/dialogue.  (Last visited:  April 20, 2023).

held from November 8, 2022 to November 10, 2022 in São Paulo, Brazil was attended by several representatives of Defendants, including Greg Adamson, the Senior Vice President of Global Regulatory Affairs at Givaudan; Jeremy Compton, Givaudan's Head of Science and Technology; Matteo Magnani, Firmenich's Chief Consumer and Innovation Officer, Ilaria Resta, Firmenich's Global President of Perfumery; Joris Theewis, IFF's Global Regulatory Strategic Lead; Gregory Ladics, IFF's Head of Product Safety and Chemical Management; and Eder Ramos, Symrise's Global President of its Fragrance Division.[45]   At this summit, Defendants discussed the latest trends in public policy and regulation, including sustainability.[46]

55.    Defendants are all members, and sit on the advisory committee, of the Research Institute for Fragrance Materials ("RIFM").[47]   RIFM holds itself out as a leading resource for the safe use of Fragrance ingredients and serves as the industry regulator in conjunction with IFRA. RIFM conducts and publishes safety assessments of all ingredients used for their aroma-producing properties.[48]   RIFM's activities include conducting toxicity tests and allergy and photo toxicity testing of raw materials.  After testing, RIFM submits the results of the screening of the materials to IFRA, which then ensures Fragrance manufacturers' compliance with all relevant legislation and the standards of safety and conduct in the industry set by IFRA.  As Defendants have authority in both RIFM and IFRA, they are able to influence the testing process for fragrances and regulatory and safety standards for the Fragrances market.

---

[45]  Global Fragrance Summit (Sao Paulo, Brazil 2022), https://globalfragrancesummit.com/program/IFRA-GFS-NOV2022.pdf.

[46]  *Id.*

[47]  RIFM, Our Leadership Teams, https://rifm.org/leadership-teams/.

[48]  RIFM, Overview of RIFM, https://rifm.org/rifm-science/.

56.     All Defendants also belong to the North American trade organization Fragrance Science & Advisory Council ("FSAC"), which they jointly launched on March 16, 2021.[49] Defendants collectively comprise 80% of FSAC's membership.[50]  Additionally, Defendants each have representation on the FASC executive team; global vice president of Symrise, Stephanie Blakely, serves as President and Chair of FSAC, Greg Adamson, a Senior Vice President of Givaudan, serves as Vice Chair and Vice President of FSAC, Luciana Castro, a Senior Vice President of Firmenich, serves as the Treasurer of FSAC, and the Vice President, Regional General Manager of NOAM Consumer Fragrances at IFF, Shardona Daneshvari, serves as Secretary of FSAC.[51]

57.     FSAC purportedly provides scientific and technical expertise to policymaking discussions, builds narratives to defend key fragrance topics of interest, and retains lobbyists to examine legal issues at the state and federal levels.[52]  Defendants, through FSAC, wield significant power in U.S. policymaking related to Fragrance.  In addition to standard board and committee meetings, FSAC holds annual meetings.  The inaugural annual meeting was held on December 9, 2021, and was attended by Defendants and Bath & Body Works, LLC, who make up the five member companies.  According to a press release, FSAC's board and several committees, which

---

[49]   HBW Insight, Lauren Nardella, World's Biggest Fragrance And Flavor Firms Join Forces To Champion Science In Public Policy (Mar. 31, 2021), https://hbw.pharmaintellige nce.informa.com/RS151176/Worlds-Biggest-Fragrance-And-Flavor-Firms-Join-Forces-To-Champion-Science-In-Public-Policy.

[50]   FSAC, *Member Companies*, Fragrance Science & Advocacy Council. Available at: https://fsac.org/about/member-companies.

[51]   FSAC, *Our Team*, Fragrance Science & Advocacy Council, https://fsac.org/about/our-team.

[52]   FSAC, Advancing the science behind the safe use of fragrance, https://fsac.org/about.

are occupied by representatives of Defendants, "met to review progress and map goals and priorities for 2022."[53]  The key issues on the agenda included "EPA approval of new ingredients, cosmetic reform" and "transparency on ingredient communication to consumers."[54]

58.    Prior to founding FSAC, Defendants belonged to the North America-focused Fragrance Creators Association ("FCA").[55]  Unlike the more exclusive FSAC, FCA has a broad and diverse 60-company member constituency,[56] consisting of Fragrance manufacturers and purchasers drawn from across North America.  The timing of Defendants' departure from FCA and the founding of FSAC is highly suspicious – Defendants announced they were leaving FCA on the same date – May 27, 2020.  This is particularly striking because in recent years, in direct conflict with Defendants' interests, FCA has been increasingly prioritizing consumer-focused fragrance safety transparency issues.  In 2019, FCA launched a consumer-centric website – fragranceconservatory.com – that provides information on perfumery and Fragrance ingredients, key regulations, and industry safety practices and sustainability efforts.  Further, in July 2020 (about two months after Defendants left), FCA elevated finished-product manufacturers to full members to facilitate greater industry collaboration, an act that would have diluted the Defendants'

---

[53]  FSAC Industry News, The Fragrance Science & Advocacy Council Holds Inaugural Annual Meeting in December 2021 (Feb. 7, 2022), https://fsac.org/communications/fragrance-science-advocacy-council-holds-inaugural-annual-meeting-december-2021.

[54]  *Id.*

[55]  HBW Insight, Lauren Nardella, World's Biggest Fragrance And Flavor Firms Join Forces To Champion Science In Public Policy (Mar. 31, 2021), https://hbw.pharmaintelligence.informa.com/RS151176/Worlds-Biggest-Fragrance-And-Flavor-Firms-Join-Forces-To-Champion-Science-In-Public-Policy.

[56]   Fragrance Creators Association, Member Benefits & Becoming a Member, https://www.fragrancecreators.org/member-center.

influence in FCA had they remained in the organization.  These industry-wide changes opened an opportunity for smaller fragrance producers to differentiate themselves through "clean" and "transparent" products and gain market share from Defendants.

59.    Instead of cooperating with the FCA's evolving mission towards greater safety and transparency measures, Defendants created a new organization – FSAC – that they controlled to lobby for legislation that would benefit the Defendants at the expense of others (*i.e.*, smaller competitors and potential new entrants into the markets, and their own customers).

60.    With relatively few companies controlling a large share of the Fragrance market protected by high barriers to entry, and frequent interaction and information sharing among competitors under the guise of the collectively controlled industry organizations, the Fragrances market exhibits characteristics that antitrust law and economics have identified as making a market susceptible to collusion and manipulation.

### C.    Defendants Conspired to Fix Prices in the Fragrance Market

61.    Defendants agreed to fix, raise, maintain, and stabilize the price of Fragrances sold in the United States.  Defendants' unlawful agreement in restraint of trade began on or before January 1, 2018, and has continued to the present.  Defendants' horizontal price fixing conspiracy is a *per se* violation of the antitrust laws under well-settled precedent.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S. Ct. 1276, 1279, 164 L. Ed. 2d 1 (2006) ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are per se unlawful.").

62.    While the details of Defendants' price fixing conspiracy are solely in their possession and thus, cannot be fully uncovered without the aid of discovery, circumstantial evidence shows the existence of the conspiracy among Defendants.

1.    **Defendants' Public Statements Show They Were Fixing Prices**

63.    Defendants' own public statements and reports show the existence of the unlawful

agreement to fix prices in the fragrances market.  In a competitive market, increasing prices should

result in customer churn, loss of sales volume, and loss of profits.  Contrary to these basic economic

principles, Defendants have repeatedly touted their ability to raise Fragrance prices during the

Class Period without any negative impact on their fragrance businesses.  Such circumstances

further confirm both that Defendants have engaged in price fixing and that they were successful in

doing so.

64.    Publicly available information shows that Defendants suspiciously reported

increasing prices around the same time on several occasions throughout the Class Period.  For

example, on August 14, 2018, Symrise reported price increases in its Fragrance segment through

a press release, announcing that "the company is in close dialogue with its customers to actively

implement price increases."[57]  Less than one month later, on September 6, 2018, in response to a

question regarding increased Fragrance input costs, IFF then-CEO Andreas Fibig also announced

that their "teams are out there and ***increasing prices as much as they can***."[58]  Shortly after, on

October 8, 2018, Givaudan confirmed that "the company continues to implement price increases

---

[57]    Symrise, Strong organic growth of 9.0% in the first half of 2018 (Aug. 14, 2018),
https://www.symrise.com/newsroom/article/strong-organic-growth-of-90-in-the-first-half-of-
2018/.

[58]    International Flavor & Fragrances Inc. at Barclays Global Consumer Staples Conference.
Boston. September 18, 2018. (Thomson StreetEvents)- Edited Transcript of International Flavor
&         Fragrances        Inc.        presentation        Thursday,
September 6, 2018 at 3:15:00pm GMT, https://www.zonebourse.com/cours/action/INTERNATI
ONAL-FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-
at-Barclays-Global-Consumer-Staples-Co-37949946/  Defendants at times refer to their Fragrance
division as their scent business.

27

in collaboration with its customers to compensate for the increases in input costs.[59]  A few months

later, during a January 25, 2019 investor call, Givaudan announced that the company was "working

on price increases" for fragrances and that Givaudan was very "confident to pass on, let's say, the

lion's share of the price increase for the combined 5%, 6% for both divisions in 2019, and there

will be a, let's say, a relatively small tail end in 2020."[60]  Coming full circle, on February 19, 2019,

IFF's VP of Global Communications and Investor Relations, Michael Deveau, announced that IFF

was looking to achieve "about a 4% price increase related to the scent" business.[61]

65.     Defendants continued touting their price increases throughout 2019.  On July 18,

2019, Givaudan's CEO, Gilles Andrier, boasted, with respect to managing raw material cost

increases, "the largest portion was in Fragrances as compared to Flavours [sic].  But I would say

on both sides, we are fully compensated with price increase."[62]  In other words, Givaudan was able

to recoup all costs in connection with increases in the costs of raw material through price increases.

On August 10, 2019, Symrise's CFO, Olaf Klinger, reported that Symrise was "successful in

---

[59]  Givaudan, 2018 Nine Month Sales (Oct. 8, 2018), https://www.givaudan.com/media/media-
releases/2018/2018-nine-month-sales.

[60]  Givaudan's (GVDBF) CEO Gilles Andrier on Q4 2018 Results (Jan. 25, 2019),
https://seekingalpha.com/article/4235672-givaudans-gvdbf-ceo-gilles-andrier-on-q4-2018-
results-earnings-call-transcript.

[61]  International Flavor & Fragrances Inc. at Consumer Analyst Group of New York
Conference Transcript, https://www.zonebourse.com/cours/action/INTERNATIONAL-
FLAVORS-F-13047/actualite/Transcript-International-Flavors-Fragrances-Inc-Presents-at-
CAGNY-2019-Conference-Feb-19-2019-37937566/.

[62]  Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2019 Results - Earnings Call
Transcript, https://seekingalpha.com/article/4275832-givaudan-sa-gvdbf-ceo-gilles-andrier-on-
q2-2019-results-earnings-call-transcript.

getting through those price increases"[63] in the fragrance segment and, during a September 2019 CEO conference, IFF's then CEO Andreas Fibig touted that IFF had "seen in the last couple of quarters a mid-single-digit growth on the scent business, which was probably driven by – half of its volume growth, half of its price growth," which demonstrates that IFF has been increasing prices since at least sometime in 2019 without repercussions.[64]

66.    Defendants increased prices again in 2020.  For example, on July 21, 2020, during an earnings call, Givaudan's Mr. Andrier reported that despite COVID-related setbacks, "on a like-for-like basis, our Fragrance division grew 4.5% and our Flavours [sic] division grew 3.6%."[65] During the same call, Mr. Andrier told investors that he expected the profitability (*i.e.*, EBITDA) of Givaudan's Fragrance business to "improve[]," in part, "[t]hanks to price increase[s]."  Less than a month later, on August 11, 2020, during its 2020 earnings results call, Firmenich's CEO, Gilbert Ghostine, reported that "in consumer fragrance, we grew our revenue by 6%."[66]  CFO, Eric Nicolas, attributed the company's (overall) increase in profitability to "successful pricing

---

[63]   Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q2 2019 Results - Earnings Call Transcript.  Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q2 2019 Results - Earnings Call Transcript, https://seekingalpha.com/article/4284389-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-q2-2019-results-earnings-call-transcript.

[64]   September 25, 2019 International Flavors & Fragrances Inc. at Sanford C Bernstein Strategic Decisions CEO Conference Transcript, https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Presents-at-Bernstein-16th-Annual-Strategic-Dec-37916407/.

[65]   Givaudan SA (GVDBF) CEO Gilles Andrier on Q2 2020 Results - Earnings Call Transcript, https://seekingalpha.com/article/4359705-givaudan-sa-gvdbf-ceo-gilles-andrier-on-q2-2020-results-earnings-call-transcript.

[66]   2020 Firmenich Earnings Results Call Transcript.

initiatives and raw material cost management."[67]  Similarly, in reporting its 2020 financial results on March 9, 2021, Mr. Klinger, Symrise's CFO, boasted that "[i]n Scent & Care, 40% of the organic growth and pricing and 60% was volume related."[68]

67.     And, consistent with 2019 and 2020, Defendants hiked prices again in 2021.  For example, on November 9, 2021, IFF's then-CEO Andreas Fibig reported that the company's fragrance division has had a "strong year" in part because of a "sales profitability expansion of 110 basis points" that had been "led by higher volume, favorable mix and higher productivity."[69] Mr. Fibig then stated that "[o]ur team has did an exceptional job increasing prices to combat inflationary pressures, something that will continue to be critical as we move forward."  On the same earnings call, CFO Glenn Richter confirmed that IFF implemented "broad-based pricing actions across all of our businesses.[70]  Symrise also confirmed 2021 price increases during an earnings call held on March 1, 2022, in which Symrise's new CEO, Dr. Heinz-Jürgen Bertram, reported that "price increase initiatives were taken early on in the second half of last year" in its Fragrance business.[71]

---

[67]  *Id.*

[68]    Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on 2020 Financial Results – Earnings Call Transcript, https://seekingalpha.com/article/4412605-symrise-ag-syief-ceo-heinz-jurgen-bertram-on-2020-financial-results-earnings-call-transcript.

[69]    Q3 2021 International Flavors & Fragrances Inc. Earning Call Transcript, https://www.fool.com/earnings/call-transcripts/2021/11/09/international-flavors-fragrances-inc-iff-q3-2021-e/.

[70]  *Id.*

[71]    Symrise AG (SYIEF) CEO Heinz-Jürgen Bertram on Q4 2021 Results - Earnings Call Transcript, https://seekingalpha.com/article/4492962-symrise-ag-syief-ceo-dr-heinz-jurgen-bertram-on-q4-2021-results-earnings-call-transcript.

68.    After several years of steady price increases, on March 17, 2022, IFF again announced price increases that affected its Fragrance business.[72]  Less than one month later, on April 12, 2022, Givaudan announced that it would keep raising prices in 2022, purportedly to offset higher input costs despite the fact that like-for-like sales rose 4.6% in the first quarter.[73]  Givaudan announced accelerated price increases again on July 21, 2022, despite the fact that like-for-like sales rose 7.9% year on year in the second quarter.[74]  Shortly thereafter, on August 2, 2022, Symrise announced general price increases (including, apparently for Fragrances) and its CEO, Dr. Bertram, boasted that the company managed to pass on the bulk of the higher costs to customers in the first half of the year.[75]  A few days later, on August 5, 2022, Firmenich followed suit and announced its intent to continue raising prices for fragrances and other products,[76] and confirmed those continuing price hikes in a November 22, 2022 press release.[77]    And, on

---

[72]  IFF Announces Global Price Increases Across All Divisions, https://ir.iff.com/news-releases/news-release-details/iff-announces-global-price-increases-across-all-divisions.

[73]  Givaudan to Keep Raising Prices After Q1 Sales Grew 4.6%, Reuters (April 12, 2022), https://www.reuters.com/business/retail-consumer/givaudan-keep-raising-prices-after-q1-sales-grew-46-2022-04-12/.

[74]  Givaudan to accelerate price increases as input costs hit margins, https://www.reuters.com/business/retail-consumer/givaudan-confirms-mid-term-targets-works-pass-higher-prices-2022-07-21/.

[75]  Symrise hikes forecast as higher prices, demand offset soaring costs, https://www.reuters.com/business/germanys-symrise-raises-sales-outlook-increased-demand-2022-08-02/.

[76]  Firmenich Posts Record Full - year Top- and Bottom- line Growth,  https://www.yahoo.com/news/firmenich-posts-record-full-top-182010078.html.

[77]    Firmenich Delivered Double-Digit Revenue Growth In the First Quarter of Financial Year 2023, Firmenich (November 22, 2022), https://www.bloomberg.com/press-releases/2022-11-22/firmenich-delivered-double-digit-revenue-growth-in-the-first-quarter-of-financial-year-2023.

November 8, 2022, IFF's CFO Glenn Richter boasted to investors that the "Scent division once again delivered a strong performance . . . due to volume growth, out price increases and productivity gains."[78]

69.     Defendants have continued to tout their ability to raise Fragrance prices in the last few months.  On January 25, 2023, Tom Hallam, Givaudan's CFO, noted to its investors that "price increases" had "partially compensated" for higher Fragrance input costs.[79]

70.     Similarly, on February 9, 2023, IFF's CFO Glenn Richter indicated that there were price increases in its Scent division.[80]  Further, despite volume issues in other parts of the business, IFF's new CEO, Frank Clyburn, noted that "in [IFF's] scent business, we feel as though our [sales] volumes are very comparable to peers and the competitors."  A week later, on February 16, 2023, Firmenich announced that "we continued to achieve strong momentum, with robust Revenue growth across the [fragrance ingredients] portfolio, supported by strong pricing measures and sustained customer demand" and the company is planning to take "further pricing actions."[81]

---

[78]  Q3 2022 International Flavors & Fragrances Inc. Earning Call Transcript, https://www.market screener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Q3-2022-Earnings-Call-Nov-08-2022-42243642/.

[79]  Givaudan   SA   (GVDBF)   Q4   2022   Earning   Call   Transcript, https://seekingalpha.com/article/4572304-givaudan-sa-gvdbf-q4-2022-earnings-call-transcript.

[80]  International Flavors & Fragrances Inc. (IFF) Q4 2022 Earnings Call Transcript, https://seekingalpha.com/article/4576967-international-flavors-and-fragrances-inc-iff-q4-2022-earnings-call-transcript.

[81]  Firmenich Delivers Strong Results in First Half of Fiscal Year 2023, https://www.firmenich.c om/company/press-release/firmenich-delivers-strong-results-first-half-fiscal-year-2023.

71.     In addition, Defendants' public statements during the Class Period strongly suggest knowledge of each other's sensitive information on pricing and sales volumes, which is also consistent with the existence of Defendants' unlawful agreement to fix prices.

72.     For example, on the February 10, 2022 conference call with investors, Andreas Fibig, CEO of IFF, confirmed that IFF was tracking competitively sensitive information when he noted that "competitors" were also raising prices and that IFF's price increases were "neck to neck" with IFF's competitors "in the market."[82]

73.     On the same call, Mr. Fibig also stated "we actually expect – and what we've seen from an awful lot of our competitors is everybody is basically implementing *the same range of pricing* in the market."

74.     As alleged above, Defendants implemented consistent price increases throughout the Class Period and was able to do so without losing sales volumes or hurting profitability.  Such price increases – with respect to magnitude and frequency – should not have been possible in a truly competitive market because customers (*i.e.*, Plaintiff and the class) would have taken their business elsewhere in response to rising prices.  Yet, Defendants' conspiracy prevented customers from switching to cheaper alternatives, therefore enabling Defendants to achieve price increases consistently – without loss of sales or profitability – over several years during the Class Period in the midst of difficult economic conditions attributable to the COVID-19 pandemic, supply chain disruptions, and inflation.

---

[82] International Flavors & Fragrances Inc. (IFF) CEO Andreas Fibig on Q4 2021 results - Earnings Call Transcript, https://seekingalpha.com/article/4486003-international-flavors-and-fragrances-inc-iff-ceo-andreas-fibig-on-q4-2021-results-earnings.

75.     This reality was observed by IFF's Chief Financial Officer, Glenn Robert Richter, on November 8, 2022 when he noted that IFF's scent division "saw 3% growth in currency-neutral EBITDA due to volume growth [and] price increase."[83]   In other words, IFF raised Fragrance prices and sold more products, not less.  This strongly suggests that Defendants' price fixing conspiracy has been effective and successful.

### 2.     Defendants Continued to Increase Prices Despite Easing Raw Materials Costs

76.     In addition to achieving outcomes inconsistent with the existence of a competitive market for Fragrances, Defendants also managed to keep increasing prices even when their reported pretext for hiking prices – increased costs of raw materials – was no longer true. Defendants' conspiracy appears to have begun in response to increases in the cost of key fragrance inputs, such as petrochemicals, vanilla, and citrus.   In a normal market, when the cost to manufacture a good increases, it is common for some of those costs to be passed on to customers in the form of higher prices.  In a competitive market, a manufacturer typically cannot pass on to the customer all these costs because if prices increase too much, customers will turn to rival competitors or stop buying altogether.   Apparently, recognizing this fact, Defendants banded together to coordinate raising their prices.  Once Defendants entered into an illegal agreement to fix prices in or around 2018, Defendants continued the cartelized pricing conduct throughout the Class Period despite, as shown before, an easing in the costs of raw materials.

77.     Inflation surrounding the cost of various raw materials began easing in or around 2020.  Yet, Defendants continued to cite raw materials as a pretext for price increases and actually

---

[83]     International Flavors & Fragrances Inc. (IFF) Q3 2022 Earnings Call Transcript, https://seekingalpha.com/article/4554858-international-flavors-and-fragrances-inc-iff-q3-2022-earnings-call-transcript.

continued increasing prices. This shows that Defendants had the collective power to increase prices without fear that a competitor (*i.e.*, one of the co-conspirators) would undercut them – a condition that is unnatural in a competitive market.  For example, among other instances, IFF disclosed on the November 8, 2022 earnings call, that "while we are clearly seeing signs of raw material inflation easing, we will continue taking appropriate targeted actions to offset inflation to maintain profitability,"[84] suggesting continued price increases even after the prices of raw materials stabilized.  Indeed, on a February 9, 2023 call regarding 2022 Q4 earnings, IFF's CFO Glenn Richter confirmed that IFF had implemented price increases (a "catch up in pricing") during the fourth quarter of 2022 in the Scent division."[85]

78.    Similarly, on January 28, 2022, during a 2021 third quarter earnings call, Givaudan's CFO Tom Hallam observed that "the raw mat[erial]s were basically flat over 2021. So there is no reasons or argument to increase prices during, during 2021."[86]  One year later, on January 25, 2023, despite continuous easing in the prices of raw materials, on January 25, 2023, Mr. Hallam revealed that as a result of (and despite) "price increases," sales and profit measures

---

[84]  Q3 2022 International Flavors & Fragrances Inc. Earning Call Transcript, https://seekingalpha.com/article/4554858-international-flavors-and-fragrances-inc-iff-q3-2022-earnings-call-transcript.

[85]  Q4 2022 International Flavors & Fragrances Inc. Earning Call Transcript, https://seekingalpha.com/article/4576967-international-flavors-and-fragrances-inc-iff-q4-2022-earnings-call-transcript.

[86]  Givaudan Q3 2021 Results – Earning Call Transcript, https://seekingalpha.com/article/4482632-givaudans-gvdbf-ceo-gilles-andrier-on-q3-2021-results-earnings-call-transcript.

increased, indicating that Givaudan continued to increase prices despite raw material inflation easing.[87]

79.    In summary, Defendants achieved generally consistent price increases in negotiations with their customers, including Plaintiff and the class, despite such increases being historically difficult to obtain and keep.  Defendants, as a result of collusive price-fixing conduct, achieved these price increases even after the cost of raw materials – the purported reason for price increases – declined or stabilized.

D.    **"Plus Factors" in the Fragrance Market Provide Additional Evidence of Defendants' Unlawful Conspiracy**

80.    Prominent legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors" which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms that are inconsistent with unilateral conduct but consistent with explicitly coordinated action."[88]  Plus factors, therefore, support an inference of unlawful collusion on the part of Defendants, as opposed to mere conscious parallelism.[89]  The factors that provide the most probative value and lead to a strong inference of collusion are referred to as "super plus factors."[90]

81.    Many plus factors are present here and further demonstrate that Defendants have engaged, and are currently engaging, in an unlawful conspiracy to fix Fragrance prices.  These

---

[87]  Givaudan SA (GVDBF) Q4 2022 Earning Call Transcript, https://seekingalpha.com/article/45 72304-givaudan-sa-gvdbf-q4-2022-earnings-call-transcript.

[88]  *See Kovacic, et al*, Plus Factors and Agreement in Antitrust Law, 110 MICH. L.REV.  393, 393 (2011),  https://www.bateswhite.com/assets/htmldocuments/media.498.pdf.

[89]  *Id.*

[90]  *Id.* at 396-97.

plus factors include: Defendants' exchange of competitively sensitive information, the high degree of concentration of the Fragrance market in the hands of Defendants, the high barriers to entry for would-be competitors in the Fragrance market, the comparatively inelastic demand for Fragrances, the fungibility of Defendants' Fragrance offerings (*i.e.*, the commodity-like nature of fragrances), the relatively high cost to customers associated with switching fragrances after manufacturing has started, the presence of a large and diversified customer base that serves as a price-verification scheme, and Defendants' opportunities and invitations to collude.

82.     *First*, upon information and belief, Defendants privately, and in secret, exchanged competitively sensitive pricing and volume information amongst themselves.  As detailed above, these exchanges of information are confirmed by IFF's admission on February 10, 2022, that it knew how an "awful lot of [its] competitors" were pricing their products.[91]  The reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.

83.     *Second*, the Fragrance market is highly concentrated.  As alleged above in more detail, the Fragrance market is highly concentrated, and Defendants collectively hold 60% of the global Fragrance market.  Markets with fewer firms are more susceptible to cartelization (like Defendants' conspiracy to fix prices) because a smaller group of competitors (like Defendants) are better able to solve the coordination and trust problems that can prevent cartel formation or

---

[91]  Q4 2021 International Flavors & Fragrances Inc. Earning Call Transcript, https://www.marketscreener.com/quote/stock/INTERNATIONAL-FLAVORS-F-13047/news/Transcript-International-Flavors-Fragrances-Inc-Q4-2021-Earnings-Call-Feb-10-2022-37844891/.

destabilize an existing cartel.[92]   In particular, empirical studies have also found that highly concentrated markets are more prone to price fixing.[93]   As a result, courts have found market concentration to constitute a plus factor.[94]

84.     *Third*, smaller Fragrance suppliers and potential new entrants face significant barriers to entry and barriers to effective competition in the Fragrance market.   As described in more detail above such barriers to entry include regulations, intellectual property and trade secrets, scale and scope, access to raw materials, the necessity of a global presence, and high capital requirements.   [*See* paragraphs 48-50].  Defendants' vertical integration, achieved both organically and through aggressive merger and acquisition activity, has further increased the industry's barriers to entry.   [*See* paragraph 51].   When a market is protected by high barriers to entry, cartelists, like Defendants, are better able to fix a high price with less risk that new entrants will come into the market and drive the price down or take market share.

85.     *Fourth*, customer demand for Fragrances is comparatively inelastic.   As described above, smell is one of the most important attributes driving end-user consumer purchase decisions. Therefore, consumer-products manufacturers, like Plaintiff and the class, cannot forgo a Fragrance purchase altogether in the event of price increases, but could seek a reasonable substitute from a different fragrance supplier in certain circumstances.   For several reasons described herein, including the high legal, regulatory, capital, and ingredient sourcing barriers to entry, reasonable

---

[92]   CR Leslie, Antitrust Amnesty, Game Theory, and Cartel Stability, 31 J. CORP. L. note 28, at 564-65.

[93]   Arthur G. Frass and Douglas F. Greer, Market Structure and Price Collusion: An Empirical Analysis, 26 J.INDUS. ECON 21, 23 (1977).

[94]   *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 772 (E.D. Pa. 2017) (finding markets that are highly concentrated conducive to collusion).

substitutes are only (or at least predominantly) supplied by Defendants.  Here, Defendants were aware of the comparatively inelastic nature of Fragrances and, by colluding to fix prices, eliminated (or, at least, greatly limited) the availability of cheaper reasonable substitutes for their customers.  As such, given the comparatively inelastic demand for fragrances, the high prices charged by Defendants' cartel were highly profitable and sustainable because the customers have no choice but to purchase from Defendants.

86.     *Fifth*, Fragrances are a commodity-like product at the initial point of sale.  As described above, Fragrances sold by the Defendants are to a large extent interchangeable, at least at the point in time when a product and its smell is first introduced into the market.   Due to high barriers to entry, new entrants and smaller competitors cannot always supply customers with fragrances in place of Defendants (as such, there are very few, if any, reasonable Fragrance substitutes available outside the cartel).  However, among the Defendants, since they have already cleared the barriers to entry, the product offerings are fungible.  As a consequence, competition among the Defendants should, in a competitive market, be based primarily on price.  Absent a collusive scheme, Defendants should have lost market share as a result of their respective price increases (and an absence of such losses suggests collusion).  This helps Defendants police the cartel.  Because quality differences are not as relevant to the purchase decision of a commodity, Defendants can monitor lost business likely attributable to a co-conspirator's defection from cartelized pricing and enforce the agreement.  Courts have also found that commodities are more

likely to be cartelized because it is easier to agree on a specific pricing range if the product is a commodity or standard.[95]

87.     *Sixth*, as described above, Defendants' many customers make regular and consistent purchases of Fragrances.  This makes the Fragrance market susceptible to cartelization because the frequent negotiations offer a mechanism for cartel members to police and enforce the cartel, as it provides a mechanism for price verification.  In other words, given the high volume of transactions, cartel members can quickly recognize if their co-conspirators are defecting and undercutting them on price because they would be able to track lost business.  This is particularly true in the Fragrance market, given that Fragrances (at least at the initial point of sale) are commodities.

88.     *Seventh*, Defendants had ample opportunity to meet, establish, coordinate, monitor, and enforce their price-fixing cartel.  Economic research shows that all else equal, industries with trade associations are more likely to facilitate the information and maintenance of price-fixing agreements like the ones at issue here.  The U.S. DOJ has also stated that "collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another."[96]  As outlined in more detail above, Defendants belong to, and hold leadership positions on, several trade organizations, which provides them with the forums to meet in order to coordinate and enforce the cartel.  [*See* paragraphs 53-59].

---

[95]  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656-57 (7th Cir. 2002) ("In addition, the product.  is highly standardized. . . . This is another reason why a successful conspiracy would not require such frequent communications as to make prompt detection likely.").

[96]  DOJ, Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For, at 6. https://www.justice.gov/atr/file/810261/download.

89.     In fact, Defendants have already demonstrated their ability and willingness to collude through, and in connection with, trade organizations when they all resigned from FCA on the same day and launched a new North American trade organization, FSAC.  Furthermore, Defendants have offices in close proximity to each other, allowing for frequent and easy communication.

90.     Indeed, in the U.S., Defendants' customer account managers and other commercial employees are concentrated in northern New Jersey and New York City.

91.     Additionally, according to publicly available sources (*e.g.*, LinkedIn), there is a revolving door for Defendants' employees who whereby leave the employ of one Defendant just to be hired by another.  For example, among many other similarly situated employees, Kellie Iuculano worked in Fragrance sales at Givaudan's New York and New Jersey offices for over seven years from 2014 to 2021 and then moved to IFF's New York office as an account manager. Similarly, Marie-Astrid Petit worked in Fragrance in account management at IFF's Paris office from 2013 to 2021 and moved to Givaudan's Paris office to perform a similar role in 2021.

92.     Such proximity and opportunity for social connections create additional opportunities for employees to establish and maintain contacts that facilitate Defendants' illegal cartel.

### E.    Governmental Investigations

93.     On March 7, 2023, the EU Commission announced that it had raided several Fragrance suppliers on concerns of a collusion in relation to the supply of Fragrances.[97]  In parallel,

---

[97]  EU Press Release, Antitrust: Commission confirms unannounced inspections in the fragrance sector, (March 7, 2023), https://ec.europa.eu/commission/presscorner/detail/en/ip_23_1532.

the Commission has sent out formal requests for information to several companies active in the Fragrance market.

94.     On the same day, the UK, Competition and Markets Authority ("CMA") and the Swiss Competition Commission ("COMCO") also opened investigations into the Fragrance industry.  The CMA announced that it "has reason to suspect anti-competitive behavior [sic] has taken place involving suppliers of fragrances and fragrance ingredients for use in the manufacture of consumer products such as household and personal care products."[98]  Similarly, COMCO stated that "there are suspicions that [main Fragrance suppliers] have coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances."[99]

95.     Antitrust authorities in the EU, UK, and Switzerland have been cooperating with the Antitrust Division of the U.S. Department of Justice in relation to the suspected collusion in the Fragrance market.  Firmenich, Givaudan, IFF, and Symrise were all raided by regulators as part of this coordinated international antitrust probe.[100]

---

[98]  GOV.UK, CMA launches investigation into fragrances and fragrance ingredient (March 7, 2023), https://www.gov.uk/government/news/cma-launches-investigation-into-fragrances-and-fragrance-ingredients.

[99]     COMCO   Press   Release,   COMCO   investigates   possible   collusions   in   the Fragrance market, (Aug. 3, 2023), https://www.weko.admin.ch/weko/en/home/medien/press-releases/nsb-news.msg-id-93502.html.

[100]   Top four fragrance groups raided in co-ordinated antitrust probe, FINANCIAL TIMES, https://www.ft.com/content/ebe2087e-198d-40dd-9615-e090facfb99f.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff bring this action on behalf of itself and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b) (3), seeking damages, as well as equitable and injunctive relief, on behalf of the following class:

> All persons and entities in the United States, its territories and the District of Columbia who purchased Fragrances directly from one or more of the Defendants from January 1, 2018 to present.

97.     Specifically excluded from the class are Defendants and their families, the directors and officers of any defendant and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

98.     The class is so numerous as to make joinder impractical. Plaintiff does not know the exact number of class members because such information presently is in the exclusive control of Defendants. Plaintiff believes that due to the nature of the Fragrances market there are likely hundreds of class members.

99.     Common questions of law and fact exist as to all members of the class. Plaintiff and the class were injured by the same unlawful conspiracy to fix prices, and Defendants' anticompetitive conduct was generally applicable to all the members of the class, and relief to the class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

• whether Defendants and their co-conspirators engaged in a combination or conspiracy to agree to fix, raise, maintain, and stabilize the price for Fragrances manufactured in the U.S., sold in the U.S., or otherwise imported in the U.S.;

• the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

• whether such combination or conspiracy violated the federal antitrust laws;

• whether the conduct of Defendants and their co-conspirators as alleged in this complaint, caused injury to Plaintiff and other members of the class;

43

- whether Defendants caused Plaintiff and the class to suffer damages in the form of overcharges on fragrances; and

- the appropriate injunctive relieve to restore competition in the Fragrance market.

100.    Plaintiff's claims are typical of the claims of class members, and Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff and all members of the class are similarly affected by Defendants' unlawful conduct in that they paid artificially high prices for Fragrances during the relevant time period.

101.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the class.  Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the class.

102.    Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

103.    The questions of law and fact common to the members of the class predominate over any question affecting only individual members, including issues relating to liability and damages.

104.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.  Moreover, the prosecution of separate actions by individual

44

members of the class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

105.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## ANTITRUST INJURY

106.    Defendants' anticompetitive conduct had the following effects, among others:

(1)    Competition among Defendants has been restrained or eliminated with respect to the Fragrance market;

(2)    The price of Fragrances sold by Defendants directly to customers, like Plaintiff and the class, has been fixed, stabilized, or maintained at artificially high levels;

(3)    Direct purchasers of Fragrances, like Plaintiff and the class, have been deprived of free and open competition.

107.    Defendants' violations of the antitrust laws have caused Plaintiff and the class to pay higher prices for Fragrances that they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages in the form of overcharges paid on Fragrance purchases.  This is an injury of the type that the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT

108.    Plaintiff and the members of the class had neither actual nor constructive knowledge of the facts constituting their claim for relief until on or around March 7, 2023, when legal and regulatory authorities in the United Kingdom and European Union announced raids in conjunction with their investigations into anticompetitive conduct.  Plaintiff and the members of the class did not discover and could not have discovered through the exercise of reasonable

diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put plaintiff or the class on inquiry notice that there was a conspiracy to fix Fragrance prices in the Fragrance market.

109.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, sharing non-public data among themselves, secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of a written record limiting any explicit reference to competitor or supply restraint communications or documents, and concealing the existence and nature of their competitor-supply restating and price discussions from non-conspirators.  The conspiracy was by its nature self-concealing.

110.    Throughout the Class Period, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and class members.

111.    The Fragrance market is not exempt from antitrust regulation, and thus, before March 7, 2023, Plaintiff reasonably considered it to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have had a reason to begin to investigate the legitimacy of Defendants' pricing practices.

112.    Plaintiff exercised reasonable diligence.  Plaintiff and the members of the class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

113.    By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and other class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## CONTINUING VIOLATIONS

114.    Plaintiff's Sherman Act claims are timely under the continuing violations doctrine. The conspiracy alleged above began as early as January 1, 2018, and continued into the present.

115.    This Complaint alleges multiple conspiratorial acts pursuant to an anticompetitive agreement among Defendants to fix Fragrance prices in the Fragrance market, and these unlawful acts occurred within the applicable statutes of limitations.

116.    As a result of Defendants' anticompetitive agreement challenged in this Complaint, throughout the Class Period and to the present, Defendants were able to, and did, sell Fragrances at artificially inflated prices.

117.    Plaintiff and class members purchased Fragrances directly from Defendants at prices artificially inflated by the conduct challenged in this Complaint throughout the Class Period.

118.    Thus, each Defendant's sale of Fragrance transaction at artificial and supracompetitive prices constituted a new overt act causing injury to the class.

119.    Accordingly, Plaintiff and members of the class were injured and may recover for damages suffered at any point in the conspiracy.

120.    Defendants' unlawful acts and practices described above continue to this day.

## CLAIMS FOR RELIEF
### Violation of §§1 and 3 of the Sherman Act (15 U.S.C. §§1, 3)

121.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

122.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2018 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy, either express or tacit, in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Fragrances manufactured, sold, or imported into the United States, in violation of §1 of the Sherman Act, 15 U.S.C. §§1 and 3.

123.    This conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3 is, in any event, an unreasonable and unlawful restraint of trade.

124.    There is no legitimate business justification for, or pro-competitive benefit attributable to, Defendants' conspiracy and overt acts in furtherance thereof.  Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

125.    Defendants' conspiracy, and the resulting impact on the prices of Fragrances occurred in and affected interstate commerce.

126.    Defendants' conspiracy has substantial anticompetitive effects, including impairing competition among Defendants in the Fragrance market and fixing, stabilizing, or maintaining the prices of Fragrances at artificially high levels.

127.    Plaintiff and members of the class directly purchased Fragrances from Defendants at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

128.    The injury to Plaintiff and members of the class are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

129.    Plaintiff and members of the class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 and Section 3 of the Sherman Act.

130.    Plaintiff and members of the class are entitled to recover damages for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the class of all others similarly situated, respectfully requests that the Court grant judgment against Defendants as follows:

A.    Determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the class, once certified;

B.    Order that the unlawful conduct alleged herein be adjudged and decreed in violation of Sections 1 and Section 3 of the Sherman Act;

C.    Order that Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.    Award Plaintiff and the class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under §4 of the Clayton Act, 15 U.S.C. §15;

49

E.      Award Plaintiff and the members of the class pre- and post-judgment interest; and

F.      Award Plaintiff and the members of the class their costs of suit, including reasonable attorneys' fees and expenses; and

G.      Award Plaintiff and the members of the class such other and further relief as the case may require and the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATE:  June 2, 2023                    Respectfully submitted,

                                        /s/ James E. Cecchi

                                       James E. Cecchi
                                       CARELLA, BRYNE, CECCHI, OLSTEIN,
                                       BRODY & AGNELLO, P.C.
                                       5 Becker Farm Road
                                       Roseland, NJ  07068
                                       Tel: (973) 994-1700
                                       jcecchi@carellabyrne.com


                                       KOREIN TILLERY PC
                                       Christopher M. Burke
                                       Walter Noss
                                       Yifan (Kate) Lv
                                       707 Broadway, Suite 1410
                                       San Diego, CA  92101
                                       Tel: (619) 6225-5620
                                       cburke@koreintillery.com
                                       wnoss@koreintillery.com
                                       klv@koreintillery.com

                                       KOREIN TILLERY LLC
                                       Stephen Tillery
                                       Carol O'Keefe
                                       505 North 7th Street, Suite 3600
                                       St. Louis, MO  63101
                                       Tel: (314) 241-4844
                                       stillery@koreintillery.com

COkeefe@koreintillery.com


STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
Allan Steyer
D. Scott Macrae
Alexander Kullar
235 Pine Street, 15th Floor
San Francisco, CA  94104
Telephone: (415) 421-3400
asteyer@steyerlaw.com
smacrae@steyerlaw.com
akullar@steyerlaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Brian D. Clark (MN #0390069)
Simeon A. Morbey (MN #0391338)
Arielle S. Wagner (MN #0398332)
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone:  (612) 339-6900
bdclark@locklaw.com
samorbey@locklaw.com
aswagner@locklaw.com

BURROUGHS LEGAL
Amelia F. Burroughs
P.O. Box 1465
Ferndale, CA 95536
Telephone: (707) 845-9393
amelia@burroughslegal.com


*Attorneys for Plaintiff B & E Associates, Inc.
(d/b/a Keystone Candle Company)*

51