# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: FRAGRANCE DIRECT PURCHASER ANTITRUST LITIGATION** | Case No. 2:23-cv-02174-WJM-JSA |
| **IN RE: FRAGRANCE INDIRECT PURCHASER ANTITRUST LITIGATION** | Case No. 2:23-cv-03249-WJM-JSA |
| **IN RE: FRAGRANCE END-USER PLAINTIFF ANTITRUST LITIGATION** | Case No. 2:23-cv-01627-WJM-JSA  Jury Trial Demanded |

## MEMORANDUM OF LAW IN OPPOSITION TO OMNIBUS MOTION TO DISMISS THE CONSOLIDATED COMPLAINTS

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

TABLES OF AUTHORITIES ........................................................................... iii

I.  INTRODUCTION ....................................................................................1

II. FACTUAL BACKGROUND......................................................................2

III. ARGUMENT .............................................................................................9

   A.  THERE IS NO HEIGHTENED PLEADING STANDARD FOR
   ANTITRUST CASES.......................................................................................9

   B.  PLAINTIFFS SUFFICIENTLY ALLEGE THAT DEFENDANTS
   AGREED TO RESTRAIN TRADE. ...................................................................11

     1.  Plaintiffs Sufficiently Plead Parallel Conduct. .........................12

     2.  Numerous Plus Factors Support the Inference of a Conspiracy. ...............20

   C.  PLAINTIFFS' CLAIMS ARE NOT TIME BARRED. ...............................34

   D.  EUPs AND IPPs HAVE STANDING FOR THEIR STATE ANTITRUST
   CLAIMS. ..................................................................................................40

     1.  *AGC* Generally Does Not Apply to the State Antitrust Claims. ................40

     2.  EUPs and IPPs Nonetheless Satisfy *AGC*. ...............................43

     3.  EUPs and IPPs Have Standing to Seek Injunctive Relief under the
     Sherman Act. ..........................................................................46

     4.  Defendants' Standing Arguments Based on State-Residency Fail. ...........47

   E.  DEFENDANTS' STATE-SPECIFIC ANTITRUST ARGUMENTS FAIL. 49

     1.  EUPs and IPPs Properly Allege Their State-Law Claims. ........49

     2.  IL and CO's Antitrust Laws Do Not Bar Federal Class Actions. ...............50

     3.  EUPs and IPPs Allege Effects and Injury in WI and NC. ........51

F.   DEFENDANTS' STATE-SPECIFIC CONSUMER PROTECTION ARGUMENTS ALSO FAIL ............................................................................52

1.   *AGC* Does Not Bar Consumer Protection Claims in NE and NY. ............52

2.   Indirect Purchasers May Bring Claims in MO, NJ, SC, and NY. ............52

3.   IPPs Are Proper Plaintiffs under MN, SC, NM, & VT's Statutes. ............53

4.   MT's & SC's Consumer Laws Do Not Bar Federal Class Actions. ..........54

5.   EUPs and IPPs Properly Allege Deception in MN, NY, PA, & WI. .........55

6.   AR, PA, and NM's Laws Encompass Anticompetitive Conduct. ............56

7.   EUPs and IPPs Allege Intrastate Effects in FL, IL, MA, and NY. ............58

8.   EUPs State a Claim under Nevada Law. .................................................58

G.   EUPs' AND IPPs' CLAIMS SATISFY STATE UNJUST ENRICHMENT LAWS. .....................................................................................................59

1.   EUPs' Unjust Enrichment Claims Are Properly Plead. ...........................59

2.   Antitrust Claims Do Not Preclude Unjust Enrichment. ...........................60

3.   IPPs Need Not Confer a Direct Benefit on Defendants. ...........................61

4.   FL, IL, MO, and SC Allow IPPs to Seek Unjust Enrichment. ..................62

5.   Unjust Enrichment Is a Recognized Claim in CA and MS. .......................62

6.   In WI, Unjust Enrichment Encompasses Antitrust Overcharges. .............63

IV.  CONCLUSION .......................................................................................63

# TABLES OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Adelphia Supply USA*,
2017 WL 5992355 (E.D.N.Y. Aug. 10, 2017) ..................................................16

*In re Aftermarket Filters Antitrust Litig.*,
2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) .....................................................42

*In re Aggrenox Antitrust Litig.*,
2016 WL 4204478 (D. Conn. Aug. 9, 2016).....................................................52

*In re Aggrenox Antitrust Litig.*,
94 F. Supp. 3d 224 (D. Conn. 2015)................................................................49

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44 (S.D.N.Y. 2016) ...............................................................31

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010).........................................................................................11

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) .......................................................................10, 15

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987) ......................................................................11, 12

*Arthur v. Microsoft Corp.*,
676 N.W.2d 29 (Neb. 2004) .............................................................................51

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................10

*In re Aspartame Antitrust Litig.*,
2007 WL 5215231 (E.D. Pa. Jan. 18, 2007)................................................*passim*

*Associated Gen. Contractors of California, Inc. v. California State
Council of Carpenters*,
459 U.S. 519 (1983)..........................................................................................39

iii

*In re Auto. Parts Antitrust Litig.*,
2013 WL 2456612 (Jun. 6, 2013) ..........................................................................56

*In re Auto. Parts Antitrust Litig.*,
2015 WL 10376960 (E.D. Mich. Dec. 30, 2015) ...............................................62

*In re Auto. Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014) ...................................................45, 61, 63

*Avery v. State Farm Mut. Auto. Ins. Co.*,
835 N.E.2d 801 (Ill. 2005) ....................................................................................57

*Baar v. Jaguar Land Rover N. Am., LLC*,
295 F. Supp. 3d 460 (D.N.J. 2018) .......................................................................49

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ..................................................................................20

*Back2Health Chiropractic Ctr., LLC v. Sentinel Ins. Co., Ltd.*,
2021 WL 960875 (D.N.J. Mar. 15, 2021) .......................................................46, 47

*BanxCorp Bankrate, Inc.*,
2009 WL 2986126 (D.N.J. Sept. 14, 2009) ...........................................................33

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................*passim*

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010)..........................................................*passim*

*In re Broiler Chicken Antitrust Litig.*,
290 F.Supp.3d 772 (N.D. Ill. 2017)................................................................43, 46

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)................................................................................................25

*Brown v. Pinnacle Restoration LLC*,
2013 WL 3148654 (Ariz. Ct. App. June 18, 2013) ..............................................61

*In re Bulk Extruded Graphite Prod. Antitrust Litig.*,
2007 WL 1062979 (D.N.J. Apr. 4, 2007)...............................................................34

iv

*In re Capacitors Antitrust Litig.*,
2018 WL 4558265 (N.D. Cal. Sep. 20, 2018) ...................................................57

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 (E.D. Mich. 2000) .....................................................61, 62

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
479 U.S. 104 (1986)................................................................................................46

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
738 F. Supp. 2d 1011 (N.D. Cal. 2010)................................................................31

*In re Chocolate Confectionary Antitrust Litig.*,
289 F.R.D. 200 (M.D. Pa. 2012) .........................................................................19

*In re Chocolate Confectionary Antitrust Litig.*,
602 F. Supp. 2d 538 (M.D. Pa. Mar. 4, 2009)......................................23, 28, 56

*In re Chocolate Confectionary Antitrust Litig.*,
999 F. Supp. 2d 777 (M.D. Pa. 2014).....................................................13, 28, 60

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383, 409 (3d Cir. 2015) ......................................................................28

*Cohen v. Subaru of Am., Inc.*,
2022 WL 721307 (D.N.J. Mar. 10, 2022) ........................................................54

*Comes v. Microsoft Corp.*,
646 N.W.2d 110 (Iowa 2002) .............................................................................42

*Cox v. Microsoft*,
8 A.D.3d 39 (N.Y.S. 2004) ...................................................................................60

*D.R. Ward Const. Co. v. Rohm and Haas Co.*,
470 F. Supp. 2d 485 (E.D. Pa. 2006).....................................................43, 44, 45

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
2015 WL 3988488 (N.D. Ill. June 29, 2015).....................................................59

*Davis v. ING Financial Advisers, LLC*,
2006 WL 8454341 (S.D. Miss. Apr. 26, 2006) .................................................60

v

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
903 F. Supp. 2d 198 (S.D.N.Y. 2012) ........................................................58, 61

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
733 F. Supp. 2d 1348 (N.D. Ga. 2010)...............................................................32

*In re Domestic Airline Travel Antitrust Litig.*,
2023 WL 5930973 (D.D.C. Sept. 12, 2023)..................................................25, 33

*In re Domestic Airline Travel Antitrust Litig.*,
221 F. Supp. 3d 46 (D.D.C. 2016)......................................................................25

*In re Domestic Drywall Antitrust Litig.*,
163 F. Supp. 3d 175 (E.D. Pa. 2016)............................................................29, 57

*In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*,
2014 WL 3971620 (D.N.J. Aug. 13, 2014) ...................................................23, 28

*In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*,
2013 WL 5503308 (D.N.J. Oct. 2, 2013) .................................................40, 42, 44

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
536 F. Supp. 2d 1129 (N.D. Cal. 2008)...............................................................51

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n*,
795 F. Supp. 2d 874 (D. Minn. 2011)..................................................................56

*Erickson v. Pardus*,
551 U.S. 89 (2007)..............................................................................................15

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
681 F. Supp. 2d 141 (D. Conn. 2009)..................................................................27

*Everest v. Leviton Mfg. Co.*,
2006 WL 381832 (Me. Super. Jan. 13, 2006) .....................................................61

*In re Fasteners Antitrust Litig.*,
2011 WL 3563989 (E.D. Pa. Aug. 12, 2011) ..........................................35, 36, 37

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009)..................................................29, 44, 58

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) ..............................................................................*passim*

*In re Foreign Exch. Benchmark Rate Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) ...................................................................31

*FTC v. Facebook, Inc.*,
  581 F. Supp. 3d 34 (D.D.C. 2022)........................................................................34

*Fuentes v. Royal Dutch Shell PLC*,
  2019 WL 7584654 (E.D. Pa. Nov. 25, 2019) ......................................................37

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018)..............................................................*passim*

*In re Generic Pharms. Pricing Antitrust Litig.*,
  368 F. Supp. 3d 814 (E.D. Pa. 2019)..............................................................*passim*

*In re Generic Pharms. Pricing Antitrust Litig.*,
  394 F. Supp. 3d 509 (E.D. Pa. 2019)....................................................................25

*Ghirardo v. Antonioli*,
  924 P.2d 996 (Cal. 1996) .....................................................................................62

*Glaberson v. Comcast Corp.*,
  2006 WL 2559479 (E.D. Pa. Aug. 31, 2006) ......................................................34

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007)...........................................................15, 57

*In re Graphics Processing Units Antitrust Litig.*,
  540 F. Supp. 2d 1085 (N.D. Cal. 2007)...........................................................41, 42

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
  2021 WL 4306018 (N.D. Cal. Sept. 22, 2021).................................................50, 57

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ..........................................................................19, 27

*Hill v. LLR, Inc.*,
  2019 WL 2404900 (D. Mont. Mar. 8, 2019) .......................................................54

vii

*Hinds Cty., Miss. v. Wachovia Bank NA.*,
  790 F. Supp. 2d 106 (S.D.N.Y. 2011) ...............................................................31

*Houck v. Substitute Tr. Servs., Inc.*,
  791 F.3d 473 (4th Cir. 2015) .........................................................................10

*In re Humira (Adalimumab) Antitrust Litig.*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020)...............................................................49

*State ex rel. Humphrey v. Philip Morris, Inc.*,
  551 N.W.2d 490 (Minn. 1996) ........................................................................60

*In re Hypodermic Prods. Antitrust Litig.*,
  2007 WL 1959225 (D.N.J. June 29, 2007)..................................................*passim*

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ...............................................................10, 20, 24

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  496 F. Supp. 2d 404 (D. Del. 2007)..................................................................43

*Interstate Circuit v. United States*,
  306 U.S. 208 (1939)......................................................................................13

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019)..............................................................32

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004)...............................................15, 46, 56, 60

*Kammer Asphalt Paving Co., Inc. v. E. China Twp. Sch.*,
  504 N.W.2d 635 (Mich. 1993)........................................................................61

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
  702 F.Supp.2d 514 (E.D. Pa. 2010)..................................................................60

*Koval v. Koval*,
  576 So. 2d 134 (Miss. 1991)...........................................................................62

*LaFlamme v. Societe Air France*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010).............................................................13

viii

*In re Lidoderm Antitrust Litig.*,
   103 F. Supp. 3d 1155 (N.D. Cal. 2015) ..............................................................56

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
   751 F. Supp. 2d 183 (D. Me. 2010) ....................................................................62

*In re Linerboard Antitrust Litig.*,
   296 F. Supp. 2d 568 (E.D. Pa. 2003) ..................................................................27

*In re Linerboard Antitrust Litig.*,
   305 F.3d 145 (3d Cir. 2002) ...............................................................................33

*In re Lipitor Antitrust Litig.*,
   868 F.3d 231 (3d Cir. 2017) ...............................................................................10

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
   2017 WL 3131977 (D.N.J. July 20, 2017) ....................................................50, 57

*In re Lithium Ion Batteries Antitrust Litig.*,
   2014 WL 4955377 (N.D. Cal. 2014) ..............................................................45, 52

*In re Loc. TV Advert. Antitrust Litig.*,
   2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) ....................................................17, 18

*Lorix v. Crompton Corp.*,
   736 N.W.2d 619 (Minn. 2007) ...........................................................................41

*Los Gatos Mercentile, Inc. v. E.I. DuPont De Nemours and Co.*,
   2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) .....................................................52

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3d Cir. 1993) .............................................................................45

*Ly v. Nystrom*,
   615 N.W.2d 302 (Minn. 2000) ...........................................................................53

*In re Magnesium Oxide Antitrust Litig.*,
   2012 WL 1150123 (D.N.J. Apr. 5, 2012) .......................................................37, 38

*Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*,
   2023 WL 8018980 (E.D. Pa. Nov. 20, 2023) ..........................................48, 49, 50

ix

*McTeer v. Provident Life & Accident Ins.*,
712 F. Supp. 512 (D.S.C. 1989) ................................................................53

*Medoza v. Zirkle Fruit Co.*,
301 F.3d 1163 (9th Cir. 2002) .................................................................45

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .................................................................47

*In re Mercedes-Benz Antitrust Litig.*,
157 F. Supp. 2d (D.N.J. 2001) ...................................................35, 36, 37

*In re Mercedes-Benz Emissions Litig.*,
2019 WL 413541 (D.N.J. Feb. 1, 2019)) ................................................54

*Meyers v. Bayer AG*,
735 N.W.2d 448 (Wis. 2007) ....................................................................51

*Miami Prod. & Chem. Co. v. Olin Corp.*,
449 F. Supp. 3d 136 (W.D.N.Y. 2020) ...............................................16, 19

*Mielo v. Steak 'N Shake Operations, Inc.*,
897 F.3d 467 (3d Cir. 2018) ....................................................................47

*In re Milk Products Antitrust Litig.*,
84 F. Supp. 2d 1016 (D. Minn. 1997) ......................................................37

*Miller v. French*,
530 U.S. 327 (2000) .................................................................................60

*Mueller v. Harry Kaufmann Motorcars, Inc.*,
859 N.W.2d 451 (Wis. Ct. App. 2014) .....................................................56

*In re Musical Instruments & Equip. Antitrust Litig.*,
798 F.3d 1186 (9th Cir. 2015) .............................................................12, 25

*Navajo Nation v. Urban Outfitters, Inc.*,
935 F.Supp.2d 1147 (D.N.M. 2013) .........................................................53

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) ....................................................................47

x

*In re New Jersey Tax Sales Certificates Antitrust Litig.*,
  2014 WL 5512661 (D.N.J. Oct. 31, 2014) .....................................................11, 30

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  350 F. Supp. 2d 160 (D. Me. 2004) ...........................................................52, 55

*In re Niaspan Antitrust Litig.*,
  42 F. Supp. 3d 735 (E.D. Pa. 2014) .................................................................25

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ........................................................................................47

*In re Packaged Seafood Prod. Antitrust Litig.*,
  2017 WL 35571 (S.D. Cal. Jan. 3, 2017) ....................................................30, 31

*In Re Packaged Seafood Prods. Antitrust Litig.*,
  242 F. Supp. 3d 1033 (S.D. Cal. 2017)........................................................56, 58

*In re Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ......................................................................26, 33

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993) ........................................................12, 13, 27, 45

*Phelps-Dickson Builders, LLC v. Amerimann Partners*,
  617 S.E.2d 664 (N.C. App. 2005)....................................................................51

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) .............................................................................9

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011)................................................................26

*In re Polypropylene Carpet Antitrust Litig.*,
  93 F. Supp. 2d 1348 (N.D. Ga. 2000)................................................................17

*Ponzio v. Mercedes-Benz USA, LLC*,
  447 F. Supp. 3d 194 (D.N.J. 2020)...................................................................48

*In re Pool Prod Distrib. Mkt. Antitrust Litig.*,
  158 F. Supp. 3d 544 (E.D. La. 2016)................................................................14

xi

*In re Pork Antitrust Litig.*,
495 F. Supp. 3d 753 (D. Minn. 2020)........................................................60, 61

*In re Pork Antitrust Litig.*,
665 F. Supp. 3d 967 (D. Minn. 2023)...............................................................47

*In re Potash Antitrust Litig.*,
667 F. Supp. 2d 907 (N.D. Ill. 2009)................................................................41

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
2006 WL 433891 (M.D. Pa. Feb. 21, 2006).....................................................38

*In re Processed Egg Prods. Antitrust Litig.*,
2013 WL 4504768 (E.D. Pa. Aug. 23, 2013) .............................................38, 39

*In re Processed Egg Prods. Antitrust Litig.*
851 F. Supp. 2d 867 (E.D. Pa. 2012).....................................................16, 55, 62

*In re Propranolol Antitrust Litig.*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017) ..............................................................59

*Quynh Truong v. Allstate Ins. Co.*,
227 P.3d 73 (N.M. 2010) ..................................................................................54

*Ramirez v. STi Prepaid LLC*,
644 F. Supp. 2d 496 (D.N.J. 2009)........................................................46, 47, 48

*Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*,
965 A.2d 460 (Vt. 2008).....................................................................................53

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023) ...............................................55

*In re Relafen Antitrust Litig.*,
221 F.R.D. 260 (D. Mass. 2004).........................................................................60

*Robinson v. Jackson Hewitt, Inc.*,
2019 WL 5617512 (D.N.J. Oct. 31, 2019) .........................................................37

*Rossi v. Standard Roofing, Inc.*,
156 F.3d 452 (3d Cir. 1998) ...............................................................................11

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ...................................................................35

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ..................................................................12

*Securian Financial Group, Inc. v. Wells Fargo Bank, N.A.*,
2014 WL 6911100 (D. Minn. Dec. 8, 2014) .......................................53

*Semeran v. BlackBerry Corp.*,
2016 WL 3647966 (D.N.J. July 6, 2016) ..........................................48

*In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*,
2022 WL 736250 (D. Del. Mar. 11, 2022) ..............................60, 62

*Shady Grove Orthopedic Assoc, P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)..............................................................50, 54

*Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*,
899 So. 2d 1222 (Fla. Dist. Ct. App. 2005) .......................................61

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC*,
737 F. Supp. 2d 380 (E.D. Pa. 2010)..........................................55, 56

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC*,
263 F.R.D. 205 (E.D. Pa. 2009)....................................................57

*Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.*,
2008 WL 3833577 (D.N.J. Aug. 12, 2008) .................................46, 47

*SigmaPharm, Inc. v. Mut. Pharm. Co.*,
772 F. Supp. 2d 660 (E.D. Pa. 2011)...............................................10

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010) ...................................................15, 30

*In re Suboxone Antitrust Litig.*,
64 F.Supp.3d 665 (E.D. Pa. 2014)............................................52, 55

*Teague v. Bayer AG*,
671 S.E.2d 550 (N.C. Ct. App. 2009)..............................................41

xiii

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................9

*In re Text Messaging Antitrust Litig.*,
   2009 WL 5066652 (N.D. Ill. Dec. 10, 2009).....................................................14

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ...........................................................................24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   586 F. Supp. 2d 1109 (N.D. Cal. 2008)............................................32, 33, 40, 56

*Tijerina v. Volkswagen Grp. of Am., Inc.*,
   2023 WL 6890996 (D.N.J. Oct. 19, 2023) ........................................................48

*In re Titanium Dioxide Antitrust Litig.*,
   959 F. Supp. 2d 799 (D. Md. 2013)...................................................................19

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) .............................................................................31

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ........................................................................21

*In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*,
   2022 WL 1013945 (D.N.J. Apr. 5, 2022).............................................46, 47, 48

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.*,
   873 F.3d 185 (3d Cir. 2017) .............................................................................32

*In re Vascepa Antitrust Litig. Indirect Purchaser Pls.*,
   2023 WL 2182046 (D.N.J. Feb. 23, 2023) ........................................................55

*Wallach v. Eaton Corp.*,
   814 F. Supp. 2d 428 (D. Del. 2011)...................................................................19

*In re Warfarin Sodium Antitrust Litig.*,
   214 F.3d 395 (3d Cir. 2000) .......................................................................42, 43

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
   648 F.3d 452 (6th Cir. 2011) ...........................................................................10

*In re Wellbutrin XL Antitrust Litig.*,
   260 F.R.D. 143 (E.D. Pa. 2009)..............................................................................52

*In re Westinghouse Sec. Litig.*,
   1998 WL 119554 (W.D. Pa. Mar. 12, 1998) ..........................................................34

*White v. PNC Fin. Servs. Grp., Inc.*,
   2013 WL 3090823 (E.D. Pa. June 20, 2013)..........................................................37

*Williams v. Foremost Ins. Co.*,
   102 F.Supp.3d 1230 (D.N.M. 2015)........................................................................54

*Woori Bank v. Merrill Lynch*,
   923 F. Supp. 2d 491 (S.D.N.Y. 2013) .....................................................................39

*Commonwealth of Pa. ex. rel. Zimmerman v. PepsiCo, Inc.*,
   836 F.2d 173 (3d Cir. 1988) .....................................................................................9

**Statutes**

15 U.S.C. § 1 ...........................................................................................................11, 63

N.J. Stat. Ann. § 56:9-12(c) ...........................................................................................52

N.M. Stat. Ann. § 57-1-3(A)...........................................................................................42

Neb. Rev. Stat. § 59-821 .................................................................................................42

Nev. Rev. Stat. § 41.600(1).............................................................................................58

Nev. Rev. Stat. § 598A.201(2).........................................................................................42

Nev. Rev. Stat. §§ 598.0903-.0999.................................................................................58

**Other Authorities**

Wright & Miller, 5B Fed. Prac. & Proc., §1358 (4th ed.) .........................................34

Fed. R. Civ. P. 8......................................................................................................9, 10, 59

Fed. R. Civ. P. 9(b) ...............................................................................................10, 35, 56

Fed. R. Civ. P. 12(b)(6)....................................................................................................34

Fed. R. Civ. P. 23 .............................................................................................................54

xv

## I.    <u>INTRODUCTION</u>

Following a period of declining prices in the Fragrance Products market, Defendants[1] issued numerous, unprecedented parallel price increases beginning in January 2018. These price increases far exceeded any rise in raw ingredient costs and were untethered to demand, generating unusually high profits for Defendants.

This suspicious, parallel conduct, now the focus of antitrust investigations worldwide, gives rise to a plausible conspiracy claim under federal and state laws. Contextual factors indicate that Defendants' price increases were collusive: (1) Defendants dominated a commoditized market that was conducive to collusion; (2) Defendants engaged in dubious activity at trade associations and industry events that preceded the price increases; (3) Defendants allocated Fragrance Products in ways that contravened economic logic; and (4) Defendants engaged in extensive public price-signaling. These factors prompted government investigations across the globe beginning in in March 2023, including by the U.S. Department of Justice ("DOJ"). Plaintiffs' allegations thus plausibly suggest a price-fixing conspiracy under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

---

[1] Defendants include Firmenich International SA, Givaudan SA, International Flavors & Fragrances Inc. ("IFF"), and Symrise AG, and certain entities owned or controlled by them (collectively, "Defendants"), as defined in Plaintiffs' consolidated Complaints. *See* Direct Purchasers Plaintiffs' Consolidated Compl., ECF No. 107 ("DC"); Indirect Purchaser Plaintiffs' Consolidated Compl., ECF No. 43 ("IC"); and End-User Plaintiffs' Consolidated Compl., ECF No. 38 ("EC").

In moving to dismiss, Defendants improperly parse Plaintiffs' allegations, isolating facts that must be considered collectively, while ignoring key allegations in their entirety. Defendants also misapply the law, relying on inapplicable pleading standards and raising premature factual disputes. Defendants' arguments regarding timeliness, standing, and the adequacy of state-law claims are similarly unavailing.

As set forth below, Plaintiffs adequately allege claims under the Sherman Act and various state-law claims. The Court should deny Defendants' Motion to Dismiss.

## II.   FACTUAL BACKGROUND

In the early to mid-2010s, prices for Fragrance Products in the United States were in a steady decline. (DC ¶ 106; IC ¶ 136; EC ¶ 160.) This changed in or around 2014, when Defendants acquired a series of smaller rivals, rapidly consolidating the Fragrances Products industry. (DC ¶¶ 71-74; IC ¶¶ 101-104; EC ¶¶ 125-28.) Defendants gained control of nearly two-thirds of the market, making it highly concentrated. (DC ¶¶ 69-70; IC ¶¶ 97-98; EC ¶¶ 123-24.) The market is also vertically integrated and marked by high barriers to entry. (DC ¶¶ 78-81; IC ¶ 108-11; EC ¶ 132-35.)

Fragrance Products are commodity chemicals susceptible to price fixing. A product with a particular scent (*e.g.*, lemon), manufactured by one Defendant, is interchangeable with the same product manufactured by another. (DC ¶¶ 58-64; IC ¶ 86-92; EC ¶¶ 112-18.) Nonetheless, Fragrance Products lack substitutes that could

restrain the ability to increase prices. (DC ¶¶ 84-85; IC ¶¶ 114-15; EC ¶¶ 138-39.) In other words, the scent can only be provided by Fragrance Products.

The buy-side of the Fragrance Products market is diffuse. (DC ¶ 82; IC ¶ 112; EC ¶ 136.) For example, IFF's 25 largest customers collectively accounted for only 29% of its sales in 2021. (DC ¶ 83; IC ¶ 113; EC ¶ 137.) These diffuse purchasers were reliant on Defendants and their Fragrance Products, as smell is a key driver of product-purchasing decisions. (DC ¶ 57; IC ¶ 54; EC ¶ 111.)

By 2018, rising costs and technological advances that allowed Defendants to reverse engineer each other's products increased competitive pressures. Beginning in January 2018, prices for Fragrance Products flattened out initially, and then increased dramatically—by over 37%—as Defendants successfully implemented a series of parallel price increases. (DC ¶ 106; IC ¶ 136; EC ¶ 160.)[2]

Specifically, in January 2018, Givaudan announced a 6% price increase effective the next month. (DC ¶ 109; IC ¶ 139; EC ¶ 164.) In April 2018, Symrise reported that it was "continu[ing] to implement price increases." (DC ¶ 110; IC ¶ 140; EC ¶ 165.) A few months later, IFF announced that its net sales had increased from March to June 2018 due in part to price increases. (DC ¶ 111; IC ¶ 141; EC

---

[2] These price patterns reflect prices that were *implemented*, not *announced*, and even Defendants admit there is a lag. *See infra* n.23.

¶ 166.) IFF, Symrise, and Givaudan also reported price increases in the second half of 2018. (DC ¶¶ 112-14; IC ¶¶ 142-44; EC ¶¶ 167-69.)

In 2019, Defendants began signaling future price increases. For example, during an investor call in January 2019, Givaudan announced that it was "working on price increases" for fragrances and felt very "confident to pass on, let's say, the lion's share of the price increase for the combined 5%, 6% for both divisions in 2019." (DC ¶ 115; IC ¶ 145; EC ¶ 170.) In February 2019, IFF also announced that it aimed to achieve "about a 4% price increase related to the scent" business. (DC ¶ 116; IC ¶ 146; EC ¶ 171.) Defendants continued to publicly signal price increases throughout 2019.[3] (DC ¶¶ 117-19; IC ¶¶ 147-49; EC ¶¶ 172-74.)

Defendants continued to raise prices in parallel in 2020, 2021, and 2022. (DC ¶¶ 120-32; IC ¶¶ 150-62; EC ¶¶ 175-87.) In April 2022 Givaudan announced plans to keep raising prices. (DC ¶ 127; IC ¶ 157; EC ¶ 182.) In May 2022, IFF reported that it had also raised prices and noted that all its competitors were doing the same. (DC ¶ 128; IC ¶ 158; EC ¶ 183.) In July 2022, Givaudan announced accelerated price increases. (DC ¶ 129; IC ¶ 159; EC ¶ 184.) Symrise and Firmenich followed suit the next month. (DC ¶¶ 130-31; IC ¶¶ 160-61; EC ¶¶ 185-86.)

---

[3] Defendants' public statements provided a mechanism to monitor and enforce their conspiracy. (DC ¶¶ 138-39; IC ¶¶ 168-69; EC ¶¶ 193-94.)

Defendants also restrained the supply of fragrance ingredients by agreeing to each produce only a specific subset of Fragrance Products, despite having the ability to produce substantially all synthetic and natural ingredients.[4] (DC ¶¶ 155, 158, 161; IC ¶ 185, 189, 192; EC ¶ 210, 213, 216.) Defendants thereby ensured that customers requiring a specific ingredient would not have the benefit of unfettered competition. (DC ¶ 155; IC ¶ 185; EC ¶ 210.) Defendants were thus able to charge customers supra-competitive prices.(DC ¶¶ 155-56; IC ¶¶ 185-86; EC ¶¶ 210-11.)

Defendants forced significant price increases during the Class Period despite such increases being historically difficult to maintain. (DC ¶ 146; IC ¶ 176; EC ¶ 201.) The magnitude and frequency of those increases could not be maintained in a competitive commodity market because customers could opt to buy from lower-cost suppliers. (DC ¶ 137; IC ¶ 167; EC ¶ 192.) But Defendants' parallel price increases and supply restraints effectively foreclosed cheaper alternatives, thereby enabling Defendants to achieve higher prices with no loss in sales or profits—notwithstanding difficult economic conditions created by the COVID-19 pandemic, supply chain disruptions, and inflation. (DC ¶ 137; IC ¶ 167; EC ¶ 192.)

---

[4] One scholar described Defendants' "gentleman's agreement" as an "informal understanding," where "the major fragrance houses would not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering." (DC ¶ 157; IC ¶ 187; EC ¶ 212.)

Defendants often claimed that price increases were needed to cover rising raw material costs, even when those input prices were in fact easing. (DC ¶ 142; IC ¶ 172; EC ¶ 197.) But Defendants' own executives acknowledged this was pretextual. For example, Givaudan's CFO admitted that "the raw mat[erial]s were basically flat over 2021. So there is no reasons [sic] or argument to increase prices during 2021." (DC ¶¶ 142-43; IC ¶¶ 172-73; EC ¶¶ 197-98) (IFF executive stating in November 2022 that "we are clearly seeing signs of raw material inflation easing"); (*see also* DC ¶ 120; IC ¶ 150; EC ¶ 175) (Givaudan CEO stating in July 2020 that raw material costs "had no material effect" on improved profits).

Notably, Defendants' profits increased sharply during the Class Period (DC ¶¶ 147-54; IC ¶¶ 177-84; EC ¶¶ 202-09), indicating that the price increases far exceeded input costs.[5] Nor did demand factors justify the price increases. (DC ¶ 144; IC ¶ 174; EC ¶ 199.) In short, Defendants' conduct cannot be explained by market forces. (DC ¶ 107; IC ¶ 137; EC ¶ 161.)

Defendants also had regular opportunities to conspire through industry associations, many of which Defendants control. (DC ¶ 90; IC ¶ 120; EC ¶ 143.)

---

[5] IFF's EBITDA surged from $160 million in Q4 2017 to $611 million in Q3 2022 (DC ¶ 148; EC ¶ 203; IC ¶ 178); Givaudan's from $496 million in H2 2017 to $810 million in H1 2022 (*id.*); Symrise's from €631 million in FY 2018 to €922 million in FY 2022 (DC ¶ 152; EC ¶ 207; IC ¶ 182); and Firmenich's from 825.5 CHF to 904.5 CHF over the same period (DC ¶ 153; EC ¶ 208; IC ¶ 183).

These include the International Fragrance Association ("IFRA"),[6] Fragrance Science & Advisory Council ("FSAC"), Fragrance Creators Association ("FCA"), Research Institute for Fragrance Materials ("RIFM"),[7] American Society of Perfumers, and World Perfumery Congress. (DC ¶¶ 91-103; IC ¶¶ 121-33; EC ¶¶ 144-56.) Defendants could use these meetings to exchange competitively sensitive pricing and volume information and organize their cartel. (DC ¶ 104; IC ¶ 134; EC ¶ 157.) Indeed, price increases often followed industry events. *See infra* Section III.B.2.c.

Defendants' trade association activity was unusual and consistent with collusion. For example, Defendants launched FSAC after *jointly* deciding to leave FCA and have added only one non-Defendant to date. (DC ¶ 94; IC ¶ 124; EC ¶ 147.) Once under investigation, IFF left FSAC and rejoined FCA. (DC ¶ 96; IC ¶ 126; EC ¶ 149.) Government regulators even raided one unnamed trade association for facilitating Defendants' anticompetitive conduct. (DC ¶ 89; IC ¶ 119; EC ¶ 142.)

Defendants also transacted with one another regularly, enabling them to exchange information about capacity and price points. (DC ¶ 67; IC ¶ 95; EC ¶ 121.)

---

[6] IFRA is currently limited to seven regular members: Defendants, Robertet Group, Takasago International Corporation, and BASF. (DC ¶ 91; IC ¶ 121; EC ¶ 144.) Defendants control IFRA's board, with a Symrise executive serving as chair since April 2020. (DC ¶ 92; IC ¶ 122; EC ¶ 145.) Former President of Givaudan's Fragrance Division and current board member served as chair from 2015-2020. *Id.*

[7] Defendants all serve on RIFM's Advisory Committee and as members of RIFM's Core Teams. (DC ¶ 97; IC ¶ 127; EC ¶ 150.)

These inter-Defendant sales increased interdependency and provided a mechanism to monitor and enforce the conspiracy. (DC ¶ 138-39; IC ¶ 168-69; EC ¶ 193-94.)

After years of parallel price increases and attendant suspicious conduct, antitrust regulators from the DOJ, European Commission ("EC"), UK Competition and Markets Authority ("CMA"), and Swiss Competition Commission ("COMCO"), executed a series of coordinated dawn raids on March 7, 2023, targeting Defendants' "possible collusion in relation to the supply of Fragrance Products" violative of "antitrust rules that prohibit cartels and restrictive business practices." (DC ¶¶ 163-67; IC ¶¶ 195-99; EC ¶¶ 218-22.)[8]

Such raids occur only when regulators have "reasonable grounds for suspecting an infringement of the competition rules." (DC ¶ 164; IC ¶ 196; EC ¶ 219.) For example, COMCO found evidence that Defendants "violated cartel law" and "coordinated their pricing policy, prohibited their competitors from supplying certain customers and limited the production of certain fragrances." (DC ¶ 166; IC ¶ 198; EC ¶ 221.) DOJ also served IFF with a grand jury subpoena, indicating potential *criminal* prosecution. (DC ¶ 174; IC ¶ 206; EC ¶ 229.) In evaluating a criminal inquiry, the DOJ considers "whether there is reason to believe that an

---

[8] Three of four Defendants (Firmenich, IFF, and Givaudan) are under investigation for entering into reciprocal "No Poach" agreements for hiring or recruiting certain employees. (DC ¶ 177; IC ¶ 209; EC ¶ 232.)

antitrust violation may have been committed." DOJ Justice Manual, 7-3.100

(updated Apr. 2022). By issuing a grand jury subpoena, DOJ determined that "a

significant amount of evidence [was] available at the inception of a case." *Id.*

## III.   ARGUMENT

### A.   THERE IS NO HEIGHTENED PLEADING STANDARD FOR ANTITRUST CASES.

To withstand dismissal, complaints need only contain a "short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

8.  Courts must "accept as true all factual allegations . . . and draw all inferences in

the facts alleged in the light most favorable to the [plaintiffs]." *Phillips v. Cnty. of

Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Courts must also consider allegations

in their entirety, not in isolation. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308, 322-23 (2007).[9] Importantly, antitrust complaints are to be liberally

construed. *Commonwealth of Pa. ex. rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173,

179 (3d Cir. 1988); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at

*6 (D.N.J. June 29, 2007).

Antitrust complaints are not subject to any heightened pleading standard.

*Twombly*, 550 U.S. at 555. A plaintiff need only allege sufficient facts, accepted as

---

[9] *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630-31 (E.D. Pa. 2010) ("Defendants' briefing attempts to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility. However . . . the allegations in the Complaint must be viewed as a whole.") (citations omitted).

9

true, to state a claim that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible if there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*[10]

"The plausibility standard is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 at 556); *see also In re Lipitor Antitrust Litig.*, 868 F.3d 231, 260 (3d Cir. 2017) (same). Thus, Plaintiffs need only "state enough facts to 'raise a reasonable expectation that discovery will reveal evidence of illegal agreement' even if the court believes such proof is improbable." *SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 669 (E.D. Pa. 2011) (quoting *Twombly*, 550 U.S. at 556). If there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible, the court *cannot* grant dismissal.[11]

---

[10] Defendants' reliance on *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010), conflates the pleading standards for the RICO and antitrust claims at issue in that case. RICO claims are subject to Rule 9(b) while antitrust claims remain subject to Rule 8.

[11] *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011).

**B.    PLAINTIFFS SUFFICIENTLY ALLEGE THAT DEFENDANTS AGREED TO RESTRAIN TRADE.**

The Sherman Act prohibits any "contract, combination, . . . or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. "Section 1 [of the Sherman Act] applies only to concerted action that restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010).[12] Under *Twombly*, alleging parallel conduct "gets a §1 complaint close to stating a claim." 550 U.S. at 546. Plaintiffs need only present some "factual enhancement," or "plus factors," sufficient to "nudge[] their claims across the line from conceivable to plausible." *Id.* at 558, 570.

Antitrust conspiracies are rarely proven by direct evidence or "smoking guns." *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998). Contrary to Defendants' assertions, Plaintiffs are not required to allege direct evidence, but may instead allege *circumstantial* facts that "raise[] a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557; *see also In re New Jersey Tax Sales Certificates Antitrust Litig.*, 2014 WL 5512661, at *5 (D.N.J. Oct. 31, 2014) ("A plaintiff may depend on either direct or circumstantial evidence of concerted action, or a blend of both, in establishing a Section 1 claim.").[13] Plaintiffs more than sufficiently do so here.

---

[12] The state antitrust statutes at issue are modeled on the Sherman Act.

[13] Defendants' reliance on *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987), is misplaced. The court there noted, in the context of summary judgment, that certain

11

**1.      Plaintiffs Sufficiently Plead Parallel Conduct.**

In the Third Circuit, "a showing of parallel conduct requires only evidence that defendants 'acted similarly,' and not evidence that they charged the same prices or engaged in identical conduct." *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 442 (E.D. Pa. 2018) ("*Generics I*") (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993)).[14]

Based on Defendants' contemporaneous statements, Plaintiffs allege numerous rounds of parallel price increases implemented by all Defendants in close proximity, some within a matter of days. *See supra* Section II. Defendants themselves admitted that they were raising prices in "the same range" (DC ¶ 139; IC ¶ 169; EC ¶ 194) and credited these increases for their higher profits. (DC ¶¶ 106, 147-153; IC ¶¶ 136, 177-183; EC ¶¶ 160, 202-08.) Defendants also jointly restrained and allocated the supply of Fragrance Products in tandem (DC ¶¶ 155-62; IC ¶¶ 185-94; EC ¶¶ 210-17), supporting their ability to maintain supra-competitive prices in excess of raw ingredient costs. These allegations are sufficient to show that

---

types of conspiracies may be "more susceptible of direct proof," but it did not hold that direct evidence was required, *see id.*, as Defendants suggest. (MTD at 17.)

[14] *See also, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'"); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) ("Under *Twombly*, parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence" of a conspiracy).

Defendants "'acted similarly.'" *Generics I*, 338 F. Supp. 3d at 442 (quoting *Petruzzi's*, 998 F.2d at 1243). No more is required. *Id.*

### a.    Plaintiffs Need Not Plead Simultaneous Conduct.

"Plaintiffs are not required to plead *simultaneous* price increases—or that price increases were *identical*—in order to demonstrate parallel conduct." *Blood Reagents*, 756 F. Supp. 2d at 630 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999)) (emphases added). "[I]t is sufficient that the price increases are reasonably proximate in time and value." *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014) ("[P]arallel pricing does not require absolutely uniform pricing decisions").[15]

Defendants parse and mischaracterize Plaintiffs' allegations to distract from their parallel pricing. Defendants erroneously claim that their 2018 price increases were not parallel because the public statements made by Givaudan (January 2018), Symrise (May 2018), and IFF (August 2018) were "separated by months." (MTD at 20-21.) But IFF's August 2018 report referred to increases "*during the second quarter of 2018*," which were contemporaneous with Symrise's announcement in

---

[15] *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *Generics I*, 338 F. Supp. 3d at 441; *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) ("[I]llegal price fixing need not be exactly simultaneous and identical in order to give rise to an inference of agreement.").

13

May 2018. (DC ¶¶ 110-11; IC ¶¶ 140-41; EC ¶¶ 165-66.)  Additionally, Givaudan issued another announcement one month before Symrise's; Symrise reported a price increase seven days after IFF; IFF made another announcement three weeks later; and Givaudan made another one month after that. (DC ¶¶ 110-14; IC ¶¶ 140-44; EC ¶¶ 165-69.) Defendants ignore these allegations entirely.

Defendants also engaged in several rounds of parallel price increases after 2018, which Defendants also ignore. For example, all Defendants announced price increases on a near monthly basis between March and August 2022, some of which were separated by days or weeks. (DC ¶¶ 126-131; EC ¶¶ 181-86; IC ¶¶ 156-161.)

These tightly-knit price increases establish parallel conduct—and would be sufficient even if they were separated by multiple months.[16] That Firmenich's first price increase was not until 2020 is unavailing. In one case in this Circuit, the court found parallel conduct where certain defendants did not raise prices until two years later, and where others did not even enter the market until a year after the first price increase. *Generics I*, 338 F. Supp. 3d at 443-44. Because there may be latecomers, "varied" actions during the initial stages of an alleged conspiracy do not negate

---

[16] *See, e.g.*, *Generics I*, 338 F. Supp. 3d at 443-44; *In re Pool Prod Distrib. Mkt. Antitrust Litig.,* 158 F. Supp. 3d 544, 559 (E.D. La. 2016) (price increases occurring over several months sufficiently pled); *In re Text Messaging Antitrust Litig.,* 2009 WL 5066652, at *5 (N.D. Ill. Dec. 10, 2009) (price increases occurring ten months apart sufficiently pled).

parallel conduct or otherwise render the existence of a conspiracy implausible. *Anderson News*, 680 F.3d at 191.[17]

Defendants chiefly rely on *Burtch v. Milberg Factors, Inc.*, for the proposition that the price increases at issue were too far apart. (MTD at 20-21.) But defendants there "were choosing to decline, decrease, and even increase credit to [a garment retailer] at different time periods." 662 F.3d 212, 228 (3d Cir. 2011). *Burtch* thus had nothing to do with the time *between* alleged parallel conduct; there was simply no parallel conduct alleged.

### b. Plaintiffs Need Not Plead Specific Amounts or Dates of Price Increases.

Defendants claim that Plaintiffs fail to specifically plead the "actual amounts" and "actual dates" of price increases. (MTD at 21-22.) It is well-settled law, however, that plaintiffs are not required to allege specific facts about the conspiracy. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'") (quoting *Twombly*, 550 U.S. at 555);[18] *see also Blood*

---

[17]*See also In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 & n.31 (D.N.J. 2004) ("[A] co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy.").

[18] *See also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (plaintiffs need not plead "specific back-room meetings between specific actors at which specific decisions were made."). Defendants criticize Plaintiffs for

*Reagents*, 756 F. Supp. 2d at 630 (plaintiffs need not "plead with specificity the price by which each [product] was increased at a particular time"); *In re Processed Egg Prods. Antitrust Litig.,* 851 F. Supp. 2d 867, 880 (E.D. Pa. 2012) ("[P]recise allegations of date, time, or place" are not required in antitrust pleadings).[19] To the contrary, "it is adequate at the motion to dismiss stage to plead parallelism through a pattern of frequent price increases in similar intervals and amounts." *Miami Prod. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 161 (W.D.N.Y. 2020).

Defendants cherry-pick three public statements as the only "quantified" increases in January 2018 (Givaudan), February 2019 (IFF), and May 2022 (IFF), and argue that those increases were too far apart and too disparate in amount to reflect parallel conduct. (MTD at 23-24.) But Plaintiffs do not allege that those three *specific* actions alone reflect parallel conduct. Instead, these actions must be viewed together with other alleged conduct from the same timeframe. For example,

---

purportedly failing to include "basic facts." (*See, e.g.*, MTD at 36-37.) But it is specific facts that Defendants actually seek. In arguing such allegations are required, Defendants misquote and misinterpret case law. In *Burtch*, for example, the court took issue with allegations that did not "specify a time or place" of an agreement in reference to *direct evidence* of a conspiracy—not circumstantial. 662 F.3d at 225.

[19] Defendants' out-of-Circuit cases are similarly unpersuasive. (*See* MTD at 22.) In *Abbott Lab'ys v. Adelphia Supply USA*, the plaintiffs failed to allege that prices increased *at all*, only that they were "very similar." 2017 WL 5992355, at \*10 (E.D.N.Y. Aug. 10, 2017). And in *Jacobs v. Tempur-Pedic Int'l, Inc.*, the plaintiffs provided *no* indication of how much prices moved. 626 F.3d 1327, 1343 (11th Cir. 2010).

16

Defendants conveniently omit that Givaudan reported a 5-6% price increase on January 25, 2019, less than a month before IFF's 4% increase announcement in February 2019. (DC ¶¶ 115-16; EC ¶¶ 170-71; IC ¶¶ 145-46.) Defendants' dismembered and misleading arguments on this point are unavailing.

### c.    The Producer Price Index is an Appropriate Measure of Price Increases.

Defendants improperly isolate Plaintiffs' allegations drawn from a U.S. Bureau of Labor Statistics' Producer Price Index, which shows distinct upward price movements during the Class Period.[20] (MTD at 18.) Defendants insist that data should be set aside because it is *aggregated* across fragrance producers, despite the fact that Defendants represent nearly two-thirds of the U.S. market. (DC ¶¶ 3, 70; IC ¶¶ 4, 98; EC ¶¶ 3, 124.) The data in fact plausibly reflects Defendants' conduct as dominant market players. Courts permit complaints to proceed where plaintiffs merely "connect the aggregate data to the presence of a potential conspiracy." *In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020). That is indisputably what Plaintiffs do here.

---

[20] *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1367 (N.D. Ga. 2000) ("As a general matter, these producer price indices [by the U.S. Bureau of Labor Statistics] are a common source of data used by economists and econometricians.").

17

Further, though "other courts have dismissed claims premised *solely* on aggregate data," *id.* (emphasis added),[21] Plaintiffs' claims rest on more. For example, Plaintiffs' allegations that prices jumped in parallel by more than 37% in May 2023 are supported by Defendants' price signaling a few months prior. (DC ¶¶ 133-36; IC ¶¶ 163-66; EC ¶¶ 188-91.) Defendants insist this 37% price increase is irrelevant because it took effect two months after the government investigations began. (MTD at 2, 19.) But Defendants also concede that the price index reflects *implemented* prices.[22] (*Id.* at 20.) Indeed, Defendants admit that price increases do not take immediate effect once announced, with a lag time of "six months."[23]  It is thus highly likely—though a factual question for discovery—that Defendants *announced* these price increases *before* the investigations began.

---

[21] The only case Defendants cite to support their aggregate data argument involved reliance on a statistical model that did "not focus on the ten [] Defendants in particular" but "all the twenty-plus [] dealers," and no other evidence of parallel conduct was otherwise alleged. (MTD at 20) (quoting *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 401 (2d Cir. 2024)).

[22] https://www.bls.gov/ppi/overview.htm ("The Producer Price Index (PPI) is a family of indexes that measures the average change over time in selling prices received by domestic producers of goods and services.").

[23] DC ¶ 128; IC ¶ 158; EC ¶ 183 (citing IFF Q1 2022 Earnings Call Transcript ("[T]here are some sectors, as we mentioned, Scent as an example, there's a lag.")); DC ¶ 135; IC ¶ 165; EC ¶ 190 (citing Firmenich Full Year 2022 Results Call Transcript ("[A]s you know, the way our industry operates there is always a lag effect on pricing and the lag effect should be around six months.")); DC ¶ 139; IC ¶ 169; EC ¶ 194 (citing IFF Q4 2021 Earnings Call Transcript ("[T]here is a lag . . . And there's two reasons for that, that there's contractual relationships . . . . It takes time to renegotiate and put it in place.")).

18

### d.    It is Irrelevant if Prices Were Subject to Negotiation.

Defendants also suggest that their price increases were purportedly subject to negotiation with customers and therefore not sufficiently parallel. (MTD at 23.) This again presents a factual inquiry that cannot be resolved on a motion to dismiss. *Cf. In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 221-222 (M.D. Pa. 2012) (analyzing the issue at class certification).

Even if the Court could consider it now, "[w]hether the price announcements consistently resulted in price increases in the same amount as the announcements is not dispositive of parallel conduct."[24] As one court explained:

> Fixing the list price is itself a Sherman Act violation, regardless of whether the actual purchases were at a lower price. Moreover, a higher list price artificially raises the starting point for negotiations, guiding actual prices higher. The Defendants would not raise list prices if they thought it would have no effect on sale prices. In short, whether sellers were ultimately successful in making sales at the higher prices is irrelevant—"a horizontal agreement to fix prices need not succeed for sellers to be liable under the Sherman Act."[25]

Thus, even if prices did not uniformly stick, customer efforts to push back against unjustifiable price increases do not mean there was no price-fixing conspiracy.

---

[24] *Miami*, 449 F. Supp. 3d at 162; *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) ("[P]rice-fixing agreements are illegal even if the parties were completely unrealistic in supposing they could influence the market price.").

[25] *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 826 (D. Md. 2013) (quoting *Flat Glass*, 385 F.3d at 361-62).

## 2.    Numerous Plus Factors Support the Inference of a Conspiracy.

Plus factors are "circumstances in which the inference of independent action is less likely than that of concerted action." *Generics I*, 338 F. Supp. 3d at 448; *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 440 (D. Del. 2011); *see Baby Food*, 166 F.3d at 122 (plus factors "show that the allegedly wrongful conduct of the defense was conscious and not the result of independent business decisions of the competitors"). The Third Circuit has identified "at least" three plus factors that support an inference of collusion: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'" *Flat Glass,* 385 F.3d at 350. The third category "consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Brokerage Antitrust*, 618 F.3d at 322 (cleaned up). Such evidence may include opportunities to conspire and the existence of government agency investigations. *See Generics I*, 338 F. Supp. 3d at 449.

Here, Plaintiffs allege the following plus factors: (a) Defendants had a significant and common motive to collude (DC ¶¶ 4, 147-54; IC ¶¶ 4, 177-84; EC ¶¶ 5, 202-09); (b) Defendants' conduct was inconsistent with independent self-

20

interest (DC ¶¶ 89-104, 140-46, 155-62; IC ¶¶ 119-34, 170-76, 185-94; EC ¶¶ 142-58, 195-201, 210-17); and (c) significant evidence of a traditional conspiracy, including that Defendants had opportunities to collude through trade associations and inter-Defendant sales (DC ¶¶ 67, 89-104; IC ¶¶ 95, 119-34; EC ¶¶ 121, 142-57), that Defendants are under investigation by regulators across the globe for anticompetitive conduct (DC ¶¶ 163-77; IC ¶¶ 195-209; EC ¶¶ 218-32), that the Class Period is marked by a shift in pricing conduct (DC ¶¶ 105-37, 141; IC ¶¶ 135-167, 170; EC ¶¶ 159-92, 195), and that Defendants' engaged in extensive public communications regarding their price increases. (DC ¶¶ 107, 139; IC ¶¶ 137, 169; EC ¶¶ 161, 194.)

Defendants ignore Plaintiffs' allegations and instead focus on certain plus factor allegations individually, arguing that, in isolation, none of them plausibly suggest a conspiracy. When Plaintiffs' allegations are considered together, as they must be, they more than meet the plausibility standard.

      **a.    Plaintiffs Plausibly Allege a Motive to Conspire Based on Discrete Characteristics of the Market.**

Various market characteristics raise an inference of plausibility when juxtaposed with parallel conduct. *Flat Glass*, 385 F.3d at 361-62.[26] For example, a

---

[26] *See also In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1265 (10th Cir. 2014) (citing characteristics of market ripe for collusion: (1) highly concentrated; (2) high entry barriers; (3) homogeneous products; (4) price-inelastic demand; (5) excess capacity; and (6) trade associations providing the opportunity for collusion).

plaintiff may show that the relevant market is ripe for collusion due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. *Id.* at 361. Allegations of declining demand and high fixed costs may also implicate an agreement when joined with allegations of parallel conduct. *Id.* at 361-62. This is precisely what Plaintiffs do here.

As discussed above, starting before and continuing into the conspiracy period, consolidation led to Defendants' control of nearly two-thirds of the commodity Fragrance Products market. (DC ¶¶ 70-75; IC ¶¶ 98-105; EC ¶¶ 124-29.) On top of being highly concentrated, the market for Fragrance Products has high barriers to entry, inelastic demand, and diffuse buyers, making it conducive to collusion. (DC ¶¶ 77-87; IC ¶¶ 107-16; EC ¶¶ 131-40.) Rising costs and technology advances that made it easier to reverse engineer each other's products increased competitive pressures and provided Defendants additional economic motive to conspire. (DC ¶ 60; IC ¶ 88; EC ¶ 114.) These factors made competition riskier, and collusion more attractive. *See Blood Reagents*, 2017 WL 3048660, at * 16.

Defendants' argument that market structure allegations cannot raise an inference of conspiracy (MTD at 34-35) is contrary to well-settled authority. As the Third Circuit noted, "[e]vidence that the defendant had a motive to enter into a price fixing conspiracy means evidence that the industry is conducive to oligopolistic price fixing." *Flat Glass*, 385 F.3d at 360. In other words, it is "evidence that the

22

structure of the market was such as to make secret price fixing feasible."[27] *Id.* Accordingly, courts in this Circuit *regularly* hold that structural evidence of the type alleged by Plaintiffs supports the plausibility of a claimed conspiracy.[28]

### b.   Defendants Acted Contrary to Their Self Interest.

"Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market." *Flat Glass*, 385 F.3d at 360-61. Here, Plaintiffs allege that Defendants increased prices well over the cost of raw ingredients, refrained from manufacturing certain products, depended on one another for the manufacture of certain Fragrance Products, and shared competitively sensitive information— conduct that would be irrational in a competitive market. (DC ¶¶ 89-104, 140-46, 155-62; IC ¶¶ 119-34, 170-76, 185-94; EC ¶¶ 142-58, 195-201, 210-17.)

### c.   Defendants Increased Prices Despite Falling Costs.

During the Class Period, Defendants' price increases outpaced any increases in raw material costs. (DC ¶¶ 140-46; IC ¶¶ 170-76; EC ¶¶ 195-201.) And when the cost of raw materials stabilized and declined, Defendants continued to increase

---

[27] *Burtch*, 662 F.3d at 227, is not to the contrary. While the Third Circuit cautioned that structural evidence *may* indicate that defendants operate in an oligopolistic market, it did not overrule its holding in *Flat Glass*.

[28] *See, e.g.*, *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, 2014 WL 3971620, at *7-8 (D.N.J. Aug. 13, 2014); *Generics I*, 338 F. Supp. 3d at 448; *Blood Reagents*, 756 F. Supp. 2d at 631; *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576-77 (M.D. Pa. Mar. 4, 2009).

prices. *Id.* Such behavior is irrational and against Defendants' individual self-interest: in a competitive industry, "a firm would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *Flat Glass*, 385 F.3d at 360-61.[29]

Defendants cling to rising costs of inputs and increased demand as "obvious alternative explanation[s]" for their price increases. (MTD at 26-27) (quoting *Brokerage Antitrust*, 618 F.3d at 326). But that inquiry is only relevant if Plaintiffs had failed to plead *any* plus factors as context.[30] Otherwise, "[*Twombly*] does not require as a general matter that the plaintiff plead facts supporting an inference of defendant's liability more compelling than the opposing inference." *Brokerage Antitrust*, 618 F.3d at n.42.[31]

Thus, "Defendants' arguments that there are plausible alternative explanations for the overarching conspiracy should be tested by discovery . . . they are not a matter

---

[29] *See also In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 628 (7th Cir. 2010) (increasing prices in the face of falling costs is "anomalous behavior because falling costs increase a seller's profit margin at the existing price, motivating him, in the absence of agreement, to reduce his price slightly in order to take business from his competitors, and certainly not to increase his price").

[30] *See Brokerage Antitrust*, 618 F.3d at 322-23, 326 & n.22 (at least one plus factor must be alleged because plus factors, "by definition" tend to rule out independent self-interest as the obvious alternative explanation for parallel conduct).

[31] *See also Twombly*, 550 U.S. at 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (internal quotations omitted).

for decision at this stage of the proceedings." *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 526-27 (E.D. Pa. 2019); *see also In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014) (plaintiffs need not "plead facts that, if true, definitely rule out all possible innocent explanations").[32]

Nonetheless, Defendants admit that raw ingredient costs could not justify their price increases (DC ¶¶ 120, 142-43; IC ¶¶ 135, 197-98; 150, 172-73; EC ¶¶ 175, 196-98), and the unusually high profits resulting from those increases undermine any such theory. Nor do demand factors provide an explanation. (DC ¶¶ 144-45; IC ¶¶ 174-75; EC ¶¶ 199-200.)[33]

### i. Defendants Allocated Customers and Limited Supply.

Plaintiffs also allege that Defendants expressly agreed not to compete with one another on certain fragrance formulas. (DC ¶¶ 155-62; IC ¶¶ 185-94; EC ¶¶ 210-

---

[32] *See also Domestic Airline Travel*, 221 F. Supp. 3d at 69 (declining to consider defendants' alternative explanations for alleged conduct).

[33] Defendants cite *Musical Instruments*, 798 F.3d at 1197 n.13, and *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993), in support of their argument that rising costs and increased demand are alternative explanations, but the cases are inapposite. *Musical Instruments* dismissed following limited discovery because plaintiffs made no other allegations other than that the data was consistent with a conspiracy. *Brooke Grp. Ltd.* held that the jury could not infer competitive injury where the district court had issued judgment as a matter of law.

17.)[34] By only producing a specific subset of fragrance ingredients, Defendants ensured that when customers needed a specific ingredient, only one or a limited number of Defendants would be able to supply that ingredient, thus suppressing competition, cementing interdependency, and allowing Defendants to increase prices above competitive levels. *Id.* If acting rationally, Defendants would have increased their array of fragrance ingredients to gain market share. They did not do so. Instead, Defendants opted to forego certain additional sales and were assured that their fellow cartel members would do the same.

In a competitive market, "supply reductions by one firm would presumably lead to other competitors filling in the gaps and prices remaining lower." *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011); *see also In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 463 (9th Cir. 1990) ("The risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely."). That did not happen here.

---

[34] Defendants claim that the Perfumery Code of Ethics and ISPC's September 2022 speech are "innocuous" and merely reflect legitimate industry concerns. (MTD at 40.) These are factual defenses that require discovery. *Generic Pharms.*, 394 F. Supp. 3d at 526-27 ("Defendants' arguments that there are plausible alternative explanations. . . should be tested by discovery"). Further, Defendants' argument about the Code of Ethics misconstrues Plaintiffs' allegations. By exclusively prohibiting plagiarism despite their ability to reverse engineer each other's respective fragrance formulas, Defendants agreed not to compete with one another and thereby restrain and allocate the supply of fragrance ingredients.

### ii.   Inter-Defendant Sales Facilitated the Exchange of Competitively Sensitive Pricing Information.

Finally, Plaintiffs allege that during the Class Period, inter-Defendant sales of necessary Fragrance supplies facilitated the exchange of competitively sensitive pricing information and provided a mechanism for monitoring and enforcing the conspiracy.[35] (DC ¶ 67; IC ¶ 95; EC ¶ 121.) These exchanges were also against Defendants' independent self-interest and support an inference of collusion. *Home Depot*, 2019 WL 3804667 at *9 (exchange of confidential and commercially sensitive information, as well as inter-defendant sales and swaps, is against self-interest); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 172-73 (D. Conn. 2009) (defendants supplying each other is contrary to economic interests and indicative of market allocation conspiracy).[36]

---

[35] Defendants cite *Petruzzi's*, 998 F.2d at 1233, arguing that Plaintiffs fail to plead how the conspiracy was enforced. *Petruzzi's* was decided in the context of summary judgment, and Defendants cite no authority that an enforcement mechanism must be alleged in order to state a claim. In any event, Defendants ignore Plaintiffs' plain allegations. (*See, e.g.*, DC ¶¶ 67, 138-139; IC ¶¶ 95, 168-69; EC ¶¶ 121, 193-94.)

[36] *See also High Fructose Corn Syrup*, 295 F.3d at 659 (recognizing that seller meeting demand surge "by buying what it needs from another seller rather than by expanding its own production, protects the other firm's market share and so preserves peace among the cartelists"); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 579 (E.D. Pa. 2003) (acknowledging that evidence of "inter-defendant sales of containerboard" is evidence of a price-fixing conspiracy).

### d.  Plaintiffs Plead Traditional Evidence of a Conspiracy.

### i.     Defendants Had Opportunities to Collude.

Defendants could collude through their sales to one another and their participation in trade associations, both of which provided opportunities to connect, engage in strategic business discussions, and gain awareness of current and future business plans. Importantly, government regulators are investigating at least one trade association for facilitating Defendants' anticompetitive conduct. (DC ¶ 89; IC ¶ 142; EC ¶ 119.)

While membership in trade associations alone is not enough to confer plausibility, it is a factor that can support an inference of an agreement. *Ductile Iron Pipe Fittings*, 2014 WL 3971620 at *8; *see also Generics I*, 338 F. Supp. 3d at 449-50; *Blood Reagents*, 756 F. Supp. 2d at 632.[37] The inference is especially appropriate here, where circumstances surrounding Defendants' participation is particularly suspect, and where "Defendants control the most important trade associations and self-regulating bodies in the fragrance market." (DC ¶¶ 90-104; IC ¶¶ 120-34; EC ¶¶ 143-58) (describing significant control over trade association boards and

---

[37] Defendants cite *In Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409 (3d Cir. 2015), to argue that allegations about executives being in the same place at the same time are insufficient. (MTD at n.14.) But that decision was at summary judgment. At the motion to dismiss stage, the court in fact credited allegations that "all defendants regularly participate in trade associations and conferences," which provide "fora in which to exchange pricing information." 602 F. Supp. at 555.

membership, as well as health, safety, and industry standards). Apart from Bath & Body Works joining more recently, Defendants formed the *entirety* of FSAC's membership during the Class Period. (DC ¶ 94; IC ¶ 124; EC ¶ 147.) After government regulators began investigating Defendants, IFF left FSAC without explanation and re-joined a different association that Defendants had uniformly departed previously. (DC ¶ 96; EC ¶149; IC ¶ 126.)[38]

Similarly unique is that Defendants' attendance at trade association and industry events often preceded price movements. For example, around two months after FSAC's annual meeting in December 2021, which was attended by all Defendants, IFF admitted in February 2022 that it knew how an "awful lot of [its] competitors" were pricing their products. (DC ¶¶ 95, 104; IC ¶¶ 125, 134; EC ¶¶ 148, 157.) After events hosted by the World Perfumery Congress in June to July every year (*see* DC ¶ 103; IC ¶ 133; EC ¶ 156.), Defendants each announced price increases in the months that followed. In 2018, Symrise announced price increases in August, and IFF followed in September. (DC ¶¶ 112, 113; IC ¶¶ 142, 143; EC

---

[38] Contrary to Defendants' assertions, Plaintiffs need not allege specific instances of communications or information exchanges at trade associations meetings to withstand dismissal. *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148 (N.D. Cal. 2009).

¶¶ 167, 168.) In 2022, Givaudan announced price increases in July, and Symrise and Firmenich announced in August. (DC ¶¶ 129-31; IC ¶¶ 159-61; EC ¶¶ 184-86.)[39]

When analyzed together with all other allegations, these opportunities to collude bolster the plausibility of the alleged conspiracy. *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 197 (E.D. Pa. 2016) ("[O]pportunities to conspire may be probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records.").

### ii.   Related, Sweeping, and Ongoing Regulatory Investigations Enhance Plausibility.

The fact that government investigators coordinated dawn raids and the DOJ issued at least one grand jury subpoena shows the seriousness with which investigators view Defendants' conduct. Contrary to Defendants' assertions, "government investigations may be used to bolster the plausibility of [antitrust conspiracy] claims." *Generics I*, 338 F. Supp. 3d at 452 (quotation marks and citations omitted). As one court in this Circuit explained:

> [I]t is perfectly permissible to take as true the fact that a government investigation has been instituted, and that therefore at least several individuals within the governmental chain of command thought certain facts warranted further inquiry into a potential criminal conspiracy.

---

[39] Defendants were also photographed together at industry events, posing with their arms around one another. (DC ¶ 102; IC ¶ 132; EC ¶ 155.)

*Id.* (quotations omitted); *see also Blood Reagents*, 756 F. Supp. 2d at 632 (finding a parallel criminal investigation conferred plausibility when combined with other plus factor allegations); *In re New Jersey Tax Sales Certificates Antitrust Litig.*, 2014 WL 5512661, at *6 n.8 (D.N.J. Oct. 31, 2014) ("Allegations of criminal investigations into anticompetitive conduct support the plausibility of antitrust conspiracy.").[40]

Further, there are *multiple* investigations into Defendants across the globe, and a grand jury subpoena was issued here, both of which are particularly probative. *In re Foreign Exch. Benchmark Rate Antitrust Litig.,* 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015) ("[D]etailed allegations of investigations . . . by regulators in seemingly every significant financial market in the world lends some credence to the conspiracy allegation"); *Packaged Seafood*, 2017 WL 35571, at *8 (emphasizing, based on a grand jury investigation, that "at least several individuals within the governmental chain of command thought certain facts warranted further inquiry into a potential criminal conspiracy").

---

[40] Numerous courts find that government investigations may be considered along with other plus factor allegations. *See, e.g.*, *Starr*, 592 F.3d at 324 (considering state and DOJ investigations in holistic analysis of civil complaint); *In re Packaged Seafood Prod. Antitrust Litig.*, 2017 WL 35571, at *8 (S.D. Cal. Jan. 3, 2017) (court could "validly consider the pending DOJ investigation in concert with Plaintiffs' other allegations"); *Hinds Cty., Miss. v. Wachovia Bank NA.,* 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (same); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (same).

### iii.    Other Factors Overlooked by Defendants Support a Plausible Inference of a Conspiracy.

Defendants ignore various other allegations that, viewed as a whole, further support the inference of a conspiracy. For example, Plaintiffs allege:

***Unprecedented Shift in Pricing Behavior***. Since *Twombly,* several courts have recognized that, "[p]arallel conduct alone may support an inference of conspiracy . . . if it consists of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason." *United States v. Apple, Inc.,* 791 F.3d 290, 315 (2d Cir. 2015) (internal marks omitted); *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 196 (3d Cir. 2017).[41] Defendants' price increases were implemented after a period of declining prices in the industry. (DC ¶¶ 140-46; IC ¶¶ 170-76; EC ¶¶ 195-201.) Even Defendants admit that the end of the period reflected a "dramatic increase"—over 37%. (MTD at 19.) Stemming from increased prices, Defendants' profits over the Class Period were likewise unprecedented. (DC ¶¶ 147-54; IC ¶¶ 177-84; EC ¶¶ 202-09.) These historically unusual circumstances further support plausibility.

---

[41] *See also, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (denying motion to dismiss where the "complaint allege[d] complex and unusual pricing practices by defendants . . . which cannot be explained by the forces of supply and demand").

***Signaling Through Public Communications***. Defendants try to minimize public statements by their own executives, arguing the public nature of the statements "weigh[] against their illegality." (MTD at 35-36) (quoting *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 920 (N.D. Cal. 2019).[42] However "collusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010).[43] Even the Federal Trade Commission ("FTC") recognizes that "[g]iven the obligation under the securities laws not to make false and misleading statements with regard to material facts," public invitations to collude may be viewed "as even more credible than a private communication." *Valassis Commc'ns, Inc.,* 2006 WL 1367833 (Apr. 19, 2006).

---

[42] Defendants' reliance on *Jones* is misplaced. The court made clear "[t]hat a comment is made in public, of course, does not inoculate any underlying illegality," and that it "is not suggesting that public statements can never constitute circumstantial evidence of a conspiracy." 400 F. Supp. 3d at 920.

[43] *See also In re Domestic Airline Travel Antitrust Litig.*, 2023 WL 5930973, at *28 (D.D.C. Sept. 12, 2023) ("[C]ourts have found it appropriate to draw inferences of conspiracy from public statements.") (collecting cases); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("[T]he form of the exchange—whether through a trade association, through private exchange . . . or through public announcements of price changes—should not be determinative of its legality.").

Thus, Plaintiffs' allegations that Defendants used public statements to signal to one another and monitor the conspiracy (DC ¶¶ 107, 138-39; IC ¶¶ 137, 168-69; EC ¶¶ 162, 193-94), and that Defendants' statements "strongly suggest knowledge of each other's competitively sensitive pricing and sales information," (DC ¶ 139; IC ¶ 169; EC ¶ 194), support the plausibility of Plaintiffs' claims. *See, e.g.*, *BanxCorp Bankrate, Inc.*, 2009 WL 2986126, at *4 (D.N.J. Sept. 14, 2009) (statements in earnings call and SEC reports were sufficient to show plausible horizontal conspiracy); *Flat Panel*, 586 F. Supp. 2d at 1116 (other public statements).

## C.    PLAINTIFFS' CLAIMS ARE NOT TIME BARRED.

"[T]he doctrine of fraudulent concealment tolls the limitation period when a plaintiff's cause of action has been obscured by the defendant's conduct." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002).[44] The clock starts when "the plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action,' not when the last act of concealment occurred." *In re Bulk Extruded Graphite Prod. Antitrust Litig.*, 2007 WL 1062979, at *3 n.3 (D.N.J. Apr. 4, 2007) (cleaned up). Despite the applicability of that doctrine here, Defendants seek to dismiss "portions" of Plaintiffs' claims, *i.e.*, Direct Purchasers

---

[44] Plaintiffs do not rely on the continuing violations doctrine (*see* MTD at 46) to support their argument that Defendants' may be held liable for damages inflicted before April 18, 2019.

Plaintiffs' "claim for any damages that allegedly accrued before April 18, 2019." (MTD at 41-42.)

As a threshold matter, Defendants' request is procedurally improper because "a Rule 12(b)(6) motion may not be used to dismiss only part of a claim," Wright & Miller, 5B Fed. Prac. & Proc., §1358 (4th ed.),[45] including on the basis of timeliness. *See Glaberson v. Comcast Corp.*, 2006 WL 2559479, at \*14 (E.D. Pa. Aug. 31, 2006) (denying motion to dismiss portions of antitrust claims as untimely), *on reconsideration in part*, 2006 WL 3762028 (E.D. Pa. Dec. 19, 2006).

Second, Defendants' argument is premature. Issues relating to fraudulent concealment, including "the date on which a plaintiff discovered, or reasonably should have discovered, the purported wrongdoing is an inherently factual inquiry that is usually not ripe for resolution on a motion to dismiss," *In re Fasteners Antitrust Litig.*, 2011 WL 3563989, at \*3 (E.D. Pa. Aug. 12, 2011), and are instead "best determined by the collective judgment, wisdom and experience of jurors." *Schmidt*, 770 F.3d at 251; *see also In re Aspartame Antitrust Litig.*, 2007 WL

---

[45] *See, e.g.*, *In re Westinghouse Sec. Litig.*, 1998 WL 119554, at \*2 (W.D. Pa. Mar. 12, 1998) ("Rule 12(b)(6) is the appropriate procedural mechanism for dismissing an entire claim or complaint, as opposed to individual allegations in support of it, as legally insufficient."); *see also FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 60 (D.D.C. 2022) (noting a "chorus" of courts "has held that a motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims." (internal quotation marks and citations omitted)).

5215231, at *6 (E.D. Pa. Jan. 18, 2007) (issues of diligence and constructive notice "are inherently factual" and "generally should not be decided on a motion to dismiss"). This approach is based on "the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014); *see id.* at 248 ("[A] complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense.").

Third, Plaintiffs adequately plead fraudulent concealment, which is subject to Federal Rule of Civil Procedure 9(b). Three factors are necessary to establish fraudulent concealment: "(1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action." *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d at 368 (D.N.J. 2001). Rule 9(b)'s requirements are "relaxed" where the specifics concerning concealment of a conspiracy are "peculiarly within the defendant's knowledge or control." *Id.* (citing *In re Craftmatic Secs. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989)); *Fasteners*, 2011 WL 3563989, at *3 (pleading standard is "relaxed" "so as not to allow sophisticated defrauders to successfully conceal the details of their fraud").

Plaintiffs' allegations more than satisfy this standard. "Price-fixing conspiracies are inherently self-concealing." *Fasteners*, 2011 WL 3563989, at *5; *Aspartame*, 2007 WL 5215231, at *6 ("[T]he majority of courts examining price-

36

fixing conspiracies have deemed such conspiracies self-concealing."). "Regardless of whether concealment is an essential element of price-fixing, secrecy is its natural lair." *Mercedes-Benz*, 157 F. Supp. 2d at 372-73.

Even if the conspiracy was not self-concealing, Plaintiffs adequately allege that Defendants fraudulently concealed their conspiracy such that any statute of limitations was tolled until at least March 7, 2023, when the EC announced its coordinated investigation. (DC ¶¶ 178-85; IC ¶¶ 227-34; EC ¶¶ 235-41.)

Plaintiffs allege Defendants carried out their conspiracy in secret, including through trade associations controlled by Defendants. (DC ¶¶ 89-104; IC ¶¶ 119-34; EC ¶¶ 142-58.) Plaintiffs also allege that Defendants concealed their conspiracy by pretextually claiming their price increases were driven by increased costs and demand (DC ¶¶ 107-18, 140-46; IC ¶¶ 137-48; 170-76; EC ¶¶ 161-73; 195-201.) Such allegations, without discovery of information exclusively in Defendants' possession, are not "conclusory" and satisfy Plaintiffs' burden to plead concealment. *See, e.g.*, *Aspartame*, 2007 WL 5215231, at *6 (allegations that "defendants used aegis of several trade organizations" to carry out conspiracy pled concealment); *In re Magnesium Oxide Antitrust Litig.*, 2012 WL 1150123, at *6 (D.N.J. Apr. 5, 2012)

(pretextual justifications for price increases).[46] "Proof of fraudulent concealment is found with *any* evidence of efforts designed to keep price fixing activities secret." *Mercedes-Benz*, 157 F. Supp. 2d at 372.[47]

Plaintiffs also adequately plead lack of notice and due diligence. (DC ¶¶ 180-83; IC ¶¶ 229-32; EC ¶¶ 235-37.) Defendants' arguments about what Plaintiffs supposedly should have known merely raise factual disputes that cannot be decided on the pleadings.[48] Moreover, "suspicious" public statements (MTD at 45), are not sufficient to put plaintiffs on notice. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 2006 WL 433891, at *4 (M.D. Pa. Feb. 21, 2006).

Defendants also rely on the wrong standard for due diligence. Plaintiffs need only allege "that the cause of action would not have been revealed even in the exercise of diligence, not that affirmative investigative steps were taken to identify

---

[46] *Fuentes v. Royal Dutch Shell PLC*, 2019 WL 7584654 (E.D. Pa. Nov. 25, 2019), and *Robinson v. Jackson Hewitt, Inc.*, 2019 WL 5617512 (D.N.J. Oct. 31, 2019), concerned "no poach" agreements, not inherently secret price fixing conspiracies.

[47] Defendants rely on *In re Milk Products Antitrust Litig.*, 84 F. Supp. 2d 1016 (D. Minn. 1997) (MTD at 44, n.22 & 45), but that court applied an exacting standard for pleading fraudulent concealment that is contrary to Third Circuit's precedent. Plaintiffs there also could not explain why they delayed filing for nearly a year after the announcement of a government investigation. *Id.* at 1024.

[48] *See, e.g.*, *Fasteners*, 2011 WL 3563989, at * 6 ("The factual nature of the inquiry involves an evaluation of Plaintiffs' exposure to these articles, the circulation of various publications, and the likelihood that a reasonable plaintiff would have read such documents."); *White v. PNC Fin. Servs. Grp., Inc.*, 2013 WL 3090823, at *6 (E.D. Pa. June 20, 2013) (whether public documents "provided Plaintiffs with constructive notice of their claims is a factual inquiry").

38

the conspiracy." *Aspartame*, 2007 WL 5215231 at \*7. Here, Plaintiffs allege Defendants affirmatively made *false* public statements about their pricing that led Plaintiffs to erroneously believe they were making purchases in a competitive market. (*See, e.g.*, DC ¶¶ 140-42, 180; IC ¶¶ 170-72, 230; EC ¶¶ 195-97, 239.) That is sufficient to plead fraudulent concealment. *See Magnesium Oxide*, 2012 WL 1150123, at \*8 (finding satisfactory allegations that false justifications for pricing decisions misled plaintiffs and declining to inquire why plaintiffs did not do more to investigate). The mere fact that prices were increasing does not absolve Defendants from their cover-up of their conspiracy.[49]

Incredibly, Defendants also argue that because Plaintiffs' counsel *did* investigate the fragrance market, that somehow precludes a claim of fraudulent

---

[49] Defendants rely on *In re Processed Egg Prods. Antitrust Litig.*, 2013 WL 4504768 (E.D. Pa. Aug. 23, 2013) ("*Eggs II*"), to suggest the court can decide on the pleadings that rising prices should put a plaintiff on notice of a price fixing conspiracy, despite a defendant's pretextual justifications for its pricing. (MTD at 44-45.) Defendants are wrong. What drove the decision in *Eggs II* was that, after leave to amend, Plaintiffs failed to allege any due diligence at all to support their fraudulent concealment theory. *Id.* at \*5. As to the claims by certain large supermarket chains, the court found they could not allege fraudulent concealment based on the defendants' explanations for price increases when the supermarkets specifically alleged that they *knew* the defendants "were cooperating to phase-in the [United Egg Producers] Certified Program" that the supermarkets later alleged to violate the antitrust laws. *Id.* at \*6. Here, by contrast, Plaintiffs not only allege due diligence, but that they were *not* aware of the Defendants' conspiracy until after the government investigations were announced. (DC ¶¶ 178-83; IC ¶¶ 227-34; EC ¶¶ 235-41.)

39

concealment. (MTD at 45.) What actually matters is that Plaintiffs did their due diligence *but did not discover the conspiracy Defendants took care to conceal.*[50] Defendants cannot have it both ways with respect to due diligence. If the Court is inclined to rule alternatively, Plaintiffs respectfully request leave to amend to address any deficiencies the Court identifies.

**D.    EUPs AND IPPs HAVE STANDING FOR THEIR STATE ANTITRUST CLAIMS.**

Defendants' arguments based on state antitrust-standing fail. The federal test for antitrust standing set forth in *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), generally does not apply to state antitrust claims brought by End-User Plaintiffs ("EUPs") or Indirect Purchaser Plaintiffs ("IPPs"). And even if it did, EUPs and IPPs satisfy *AGC*.

**1.    *AGC* Generally Does Not Apply to the State Antitrust Claims.**

*AGC* is inapplicable to state antitrust claims unless it has been expressly adopted under state law. *See In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *14-16 (D.N.J. Oct. 2, 2013) ("*DIPF*") (holding *AGC* inapplicable to state antitrust claims unless it "has been adopted as the law of [the] states"). To show *AGC* applies, Defendants must perform

---

[50] Defendants' reliance on *Woori Bank v. Merrill Lynch*, 923 F. Supp. 2d 491 (S.D.N.Y. 2013), is even further afield. The plaintiff's claims were found untimely *under Korean law,* which applied an "inquiry notice standard." *Id*. at 495-96.

an "individualized analysis on a per state basis" showing that the "highest court in [each] state[] would apply the *AGC* factors." *Id.* at \*15-16; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (declining to apply *AGC* to state antitrust claims absent showing of "a clear directive from those states' legislatures or highest courts").

Defendants fail to make the requisite showing. In lieu of state-level analysis, and without any legal discussion, Defendants rely on a single footnote and an external appendix of case citations claiming some states have adopted *AGC* and others "likely would." (MTD at 47 n.23.) This appendix-driven argument not only exceeds Defendants' page limitations, it fails to show that each state's highest court has adopted *AGC*. For all but a few states,[51] Defendants fail to cite any controlling state authority, instead relying on a hodgepodge of lower-court decisions, federal opinions, "harmonization" rules, and likelihood arguments that are insufficient to invoke *AGC*. *See In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) ("*GPI*") (holding harmonization provisions and intermediate state-court decisions are insufficient to apply *AGC*); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 943-44 (N.D. Ill. 2009) (same), *aff'd sub nom. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012).

---

[51] Plaintiffs concede that *AGC* has been adopted in Iowa, Nebraska, and Nevada.

Defendants' appendix also selectively omits key precedent, fatal to their argument, where state courts have expressly held *AGC* is not applicable to indirect purchaser claims like EUPs and IPPs'. *See, e.g.*, *Teague v. Bayer AG*, 671 S.E.2d 550, 557 (N.C. App. 2009) (holding *AGC* does not apply to indirect purchaser claims under North Carolina law); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627 (Minn. 2007) (same for Minnesota). Defendants also rely heavily on so-called "*Visa* cases," where courts applied *AGC* to test the standing of people that did not use the price-fixed products (credit card payments) but instead used non-price fixed products (cash or checks).[52] Here, EUPs and IPPs are in the distribution chain as they purchased either the price-fixed fragrances or products containing the price-fixed fragrances. As other courts have held, the *Visa* cases do not support applying *AGC* to indirect purchasers like EUPs and IPPs. *See In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *8 (N.D. Ill. Nov. 5, 2009) (holding *Visa* cases insufficient to apply *AGC* to indirect purchasers).

Because Defendants do not show that *AGC* has been adopted by most states' highest courts, the Court should follow other federal courts and "decline to undertake the back-breaking labor involved in deciphering the state of antitrust standing in each

---

[52] Defendants cite the *Visa* cases and similar *American Express* cases as a basis to apply *AGC* to antitrust claims in California, the District of Columbia, Illinois, Iowa, Maine, Michigan, Nebraska, New Mexico, New York, North Dakota, Rhode Island, South Dakota, and Wisconsin. *See* Defs' App'x C.

42

of those states." *DIPF*, 2013 WL 5503308, at *16; *GPI*, 540 F. Supp. 2d at 1097 (same). *AGC* does not apply to a majority of EUPs and IPPs' state claims.

### 2.   EUPs and IPPs Nonetheless Satisfy *AGC.*

Even in Iowa, Michigan, Nebraska, Nevada, and New Mexico[53]—where *AGC* does apply—EUPS and IPPs satisfy the *AGC* test*,* as defined by the Third Circuit, which evaluates antitrust standing based on five factors: (1) the causal connection between the antitrust violation and the alleged harm; (2) whether plaintiff suffered an antirust injury; (3) the directness of the injury; (4) whether more directly injured parties have a motivation to sue; (5) the complexity of damages or risk of duplicative recovery. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399 (3d Cir. 2000) (citing *AGC*, 459 U.S. at 535-46). EUPs and IPPs' allegations satisfy all five factors.

### a.   Defendants' Conduct Caused EUPs and IPPs' Antitrust Injuries.

The first two *AGC* factors are satisfied because the overcharges that IPPs and EUPs paid for Fragrance Products and goods containing them (EC ¶ 371; IC ¶¶ 210-18) is the "inextricabl[e]" result of Defendants' price fixing; "[it] is difficult to imagine a more formidable demonstration of antitrust injury." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 401 (holding indirect purchasers who paid overcharges

---

[53] All three states are *Illinois Brick* repealer states. *Comes v. Microsoft Corp.*, 646 N.W.2d 110, 451 (Iowa 2002); Neb. Rev. Stat. § 59-821; Nev. Rev. Stat. § 598A.201(2).

for blood-clot drug had standing despite "various links of middlemen"); *see also D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 502 (E.D. Pa. 2006) (finding standing under *AGC* where indirect purchasers "paid significantly more for products containing plastic additives").

### b. Defendants Directly Caused EUPs and IPPs' Injuries.

The third *AGC* factor, "directness," is also satisfied because the state antitrust statutes at issue expressly legislate that indirect purchasers' injuries are sufficiently direct. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007) (holding state statutes that permit indirect purchasers claims satisfy *AGC*'s "directness" inquiry); *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 814-15 (N.D. Ill. 2017) (same).

In any case, EUPs and IPPs allege sufficient facts to show their injury was direct. *See Broiler Chicken*, 290 F. Supp.3d at 813-14 (finding injury direct where price-fixed chicken was passed "through wholesalers and retailers to consumers" despite no allegation of source); *D.R. Ward,* 470 F. Supp. 2d at 503 (finding "direct harm" where price-fixed additives were "passed through the stream of commerce" into consumer products bought by indirect purchasers).

Defendants' "directness" arguments are also premature. Directness challenges are fact-intensive and not properly resolved on a motion to dismiss. *Id.* ("[Discovery] is necessary to develop [the] factual issues that bear upon [] directness").

44

**c. The Existence of Direct Purchasers and Possibility of Duplicative Recovery Are Immaterial to EUPs and IPPs' Standing.**

Under the fourth *AGC* factor, the existence of direct purchasers is not relevant to EUPs and IPPs' standing because the state antitrust laws at issue specifically authorize indirect purchasers to bring claims alongside direct purchasers. *See D.R. Ward*, 470 F. Supp. 2d at 503 (holding the presence of direct purchasers "loses relevance when applied to [state repealer] statutes").

For the same reasons, the fifth *AGC* factor, duplicative recovery, is also irrelevant, as repealer states have "made the policy decision that duplicative recovery may permissibly occur." *Flash Memory*, 643 F. Supp. 2d at 1156; s*ee also DIPF*, 2013 WL 5503308, at *18 (finding duplicative recovery inapplicable to IPP standing in repealer states).

**d. Plaintiffs' Damages Claims Are Not Speculative.**

The last *AGC* factor, the complexity of damages, is not a basis to dismiss indirect purchaser claims at the pleading stage. *See, e.g.*, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1169 (3d Cir. 1993) (holding complex damages calculations insufficient to deny standing under *AGC*); *D.R. Ward*, 470 F. Supp. 2d at 504 (declining to rule whether damages were unduly speculative under *AGC* "without the benefit of any discovery or expert testimony").

45

Here, the overcharges that IPPs paid when they bought Fragrance Products and that IPPs and EUPs paid when they bought goods containing price-fixed Fragrances are discernible and not speculative. *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 999 (E.D. Mich. 2014) (finding damages non-speculative where indirect purchasers purchased vehicles containing price-fixed parts). While Defendants argue that various factors affect consumer prices (MTD at 48-51), this is a focus of expert analysis, not a standing problem. *See In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *15 (N.D. Cal. 2014) ("[T]o disentangle the alleged overcharge[s] from other pricing factors" is a "problem of proof . . . [not] standing"); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (similar).

### 3. EUPs and IPPs Have Standing to Seek Injunctive Relief under the Sherman Act.

For the same reasons explained above, EUPS and IPPs have standing under the Sherman Act to bring injunctive claims, to which most *AGC* factors do not apply. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110, n.5-6 (1986) ("[M]any of [the *AGC*] factors are not relevant to the standing inquiry [for injunctive claims]"); *Generics I*, 338 F. Supp. at 456 (similar). Where claims do not seek damages, any injury "directly attributable to the conspiracy" satisfies *AGC*. *Broiler Chicken*, 290 F. Supp. 3d at 814.

### 4.    Defendants' Standing Arguments Based on State-Residency Fail.

Defendants argue that IPPs lack standing to assert claims on behalf of class members in states where they do not reside. (MTD at 53-54.) Most courts in this District reject this argument, holding it should be addressed at class certification, not a motion to dismiss.[54] *See, e.g.*, *Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.*, 2008 WL 3833577, at *9 (D.N.J. Aug. 13, 2008) (refusing to dismiss claims in states where no named plaintiff resided before class certification). Whether IPPs' claims and other state law claims are similar enough to warrant class treatment is a "predominance" question that should "be resolved at [] class certification." *Ramirez*, 644 F. Supp. 2d at 505.[55]

The Court should follow this majority approach, which derives from Supreme Court precedent and "seminal" "Third Circuit jurisprudence." *Valsartan*, 2022 WL

---

[54] *Back2Health Chiropractic Ctr., LLC v. Sentinel Ins. Co., Ltd.,* 2021 WL 960875, at *6 (D.N.J. Mar. 15, 2021); *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.,* 2022 WL 1013945, at *4 (D.N.J. Apr. 5, 2022); *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 505 (D.N.J. 2009); *Sheet Metal Workers Nat'l Health Fund v. Amgen, Inc.*, 2008 WL 3833577, at *9 (D.N.J. Aug. 13, 2008); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at *15 (D.N.J. June 29, 2007) (indirect purchaser antitrust class action); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 542 (D.N.J. 2024) (indirect purchaser antitrust class action).

[55] State laws are often sufficiently similar, such that named plaintiffs in one state may represent absent class members in others. *See, e.g.*, *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 984, 1009-10 (D. Minn. 2023) (granting motion for certification of nationwide class brought by eleven Commercial IPPs where "the variations in states' antitrust, consumer protection, and unjust enrichment laws Defendants identified are not material.").

1013945, at *4; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (holding class determinations should occur before standing where they are "logically antecedent"); *Hypodermic Products,* 2007 WL 1959225, at *15 (rejecting dismissal arguments based geographic standing as "premature," citing *Ortiz*); *Sheet Metal Workers,* 2008 WL 3833577, at *9 (same); *Melendres v. Arpaio*, 784 F.3d 1254, 1262–63 (9th Cir. 2015) (collecting cases, noting "most other federal courts" decide issue at class certification) (cleaned up).

Two recent Third Circuit opinions—*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361 (3d Cir. 2015) and *Mielo v. Steak 'N Shake Operations, Inc.*, 897 F.3d 467, 478 (3d Cir. 2018)—further support that if a "named plaintiff has standing [in one state], it can bring [other state] claims on behalf of a nationwide class." *Back2Health,* 2021 WL 960875, at *6-7 ("[T]he Third Circuit's binding precedent controls"). Defendants' authority, in contrast, relies on cases that have been called into doubt after *Neale* and *Mielo*, leading one court to reverse a dismissal.[56] *See Valsartan,* 2022 WL 1013945, at *2-5.

---

[56] Defendants rely on *Tijerina v. Volkswagen Grp. of Am., Inc.*, 2023 WL 6890996, at *8 (D.N.J. Oct. 19, 2023). (*See* MTD at 53.) *Tijerina*, in turn, relies in part on *Ponzio v. Mercedes-Benz USA, LLC,* 447 F. Supp. 3d 194, 223 (D.N.J. 2020) and *Semeran v. BlackBerry Corp.*, 2016 WL 3647966 (D.N.J. July 6, 2016)). *See also Valsartan,* 2022 WL 1013945, at *3 (explaining that *Semeran* has been overruled by its judge, calling *Ponzio* into doubt).

The Court should follow *Valsartan, Hypodermic Products*, *Ramirez*, *Back2Health*, and *Sheet Metal Workers*—along with most other federal courts—and determine the states in which IPPs may bring class claims at class certification. Defendants' premature bid to narrow class claims before then should be rejected.

## E.   DEFENDANTS' STATE-SPECIFIC ANTITRUST ARGUMENTS FAIL.

### 1.   EUPs and IPPs Properly Allege Their State-Law Claims.

The same allegations that support EUPs' and IPPs' Sherman Act claims, *supra* at Section III.B, also support their state-law antitrust, consumer-protection, and unjust enrichment claims, which generally do not impose a heightened pleading standard. *See Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*, 2023 WL 8018980, at *11 (E.D. Pa. Nov. 20, 2023) ("*Merck*") ("[W]here [] federal antitrust, state antitrust, and state consumer protection claims [are] all rooted in the same anticompetitive conduct, the complaint's antitrust allegations are generally sufficient to support the [state-law] claims.").

EUPs and IPPs nonetheless plead detailed state-specific allegations for each of their 44 state-law claims. (EC ¶¶ 272-297; IC ¶¶ 263-290.) These extensive state-level allegations, coupled with their broader allegations of anticompetitive conduct,

go well beyond what is required to state a claim under each state's laws. *See Merck*, 2023 WL 8018980, at *11 (collecting cases).[57]

EUPs' and IPPs' consumer-protection claims are further supported by additional allegations of Defendants' illegal conduct, like their deceptive public statements (EC ¶¶ 195-96; IC ¶¶ 170-71) and attempts to collude on pricing. (EC ¶¶ 162-192; IC ¶¶ 137-167.) These allegations provide an independent and supplemental basis for upholding EUPs' and IPPs' consumer protection claims, which proscribe a broader range of conduct than do antitrust laws alone.

### 2. IL and CO's Antitrust Laws Do Not Bar Federal Class Actions.

Procedural rules in Illinois state court do not preclude EUPs and IPPs from bringing class actions in federal court. *See Shady Grove Orthopedic Assoc, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406-10 (2010) (holding state procedural limits on class actions do not apply in federal court). In *Shady Grove,* "the Supreme Court held that, despite the fact that a state statute prohibits certain matters from

---

[57] Defendants' cited authority (*see* MTD at 52-53) merely holds that certain pleading defects not relevant here can affect both state and federal claims. *See Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 464 (D.N.J. 2018) (dismissing state-law claims where complaint "fail[ed] to allege an illegal concerted action"); *In re Humira (Adalimumab) Antitrust Litig.,* 465 F. Supp. 3d 811, 830-31 (N.D. Ill. 2020), a*ff'd sub nom. Mayor and City Council of Baltimore v. AbbVie Inc.,* 42 F.4th 709 (7th Cir. 2022) (dismissing state-law claims where conduct was protected by the *Noerr-Pennington* doctrine); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255 (D. Conn. 2015) (dismissing claims that contained a repeated sentence ending in a citation to a different state statute "with no elaboration").

proceeding as class action, such a bar does not apply to federal law suits." *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *25 (D.N.J. July 20, 2017) (upholding IPP class action under Illinois Antitrust Act); *Merck,* 2023 WL 8018980, at *14 (same).

Likewise, Colorado's 2023 amendment allowing indirect-purchaser class actions permits EUPs' and IPPs' antitrust claims, which allege conduct that occurred in 2023 and "continues into the present." (EC ¶¶ 159, 259; IC ¶¶ 135, 247.) *See In re Hard Disk Drive Suspension Assemblies Antitrust Litig.,* 2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) (upholding RI antitrust claims where alleged class period of 2005–2016 partially postdated 2013 statutory amendment).

### 3.    EUPs and IPPs Allege Effects and Injury in WI and NC.[58]

Defendants' arguments concerning Wisconsin and North Carolina's antitrust laws also fail because they ignore EUPs' and IPPs' allegations that price-fixed products entered, and caused injury within, both states. (*See* EC ¶¶ 291, 297; IC ¶¶ 281, 290.) Such intrastate effects satisfy both state's antitrust laws, which prohibit anticompetitive conduct *affecting in-state residents* and are not limited to purely intrastate commerce.[59]

---

[58] EUPs and IPPs acknowledge that they have not alleged sufficient intrastate activity in Mississippi and request leave to amend.

[59] *See, e.g.*, *Meyers v. Bayer AG*, 735 N.W.2d 448, 463 (Wis. 2007) ("[P]laintiffs need not allege that the challenged conduct disproportionately affected Wisconsin,

## F.    DEFENDANTS' STATE-SPECIFIC CONSUMER PROTECTION ARGUMENTS ALSO FAIL

### 1.    *AGC* Does Not Bar Consumer Protection Claims in NE and NY.

Nebraska and New York do not apply *AGC*'s antitrust-standing analysis to their consumer protection statues.[60] *See Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 38 (Neb. 2004) (holding "any person who is injured" has standing, with "no limitation on who may sue"); *Los Gatos Mercentile, Inc. v. E.I. DuPont De Nemours and Co.*, 2015 WL 4755335, at *22-23 (N.D. Cal. Aug. 11, 2015) (holding *AGC* does not apply to NY consumer protection law).  Regardless, EUPs and IPPs satisfy *AGC*, as described above. *Supra* Section III.D.2.

### 2.    Indirect Purchasers May Bring Claims in MO, NJ, SC, and NY.

Contrary to what Defendants argue, indirect purchasers may bring claims under Missouri, New Jersey, and South Carolina's consumer protection laws. *See Lithium Ion Batteries*, 2014 WL 4955377, at *19-20 (upholding IPP claims under Missouri law); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814,

---

only that the challenged conduct substantially affected the people of Wisconsin and had impacts in this state."); *Phelps-Dickson Builders, LLC v. Amerimann Partners*, 617 S.E.2d 664, 671 (N.C. App. 2005) (holding North Carolina's Unfair Trade Practice Act requires conduct "in or affecting [North Carolina] commerce"); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 534-35 (E.D. Pa. 2010).

[60] Defendants' reliance on *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1142-43 (N.D. Cal. 2008), is unpersuasive because the plaintiffs there conceded the issue, and the opinion is inconsistent with EUPs' more recent authority discussed above. *See id.* at 1142.

840-41 (E.D. Pa. 2019) ("*Generics II*") (similar under Missouri, New Jersey, and South Carolina consumer protection laws).[61]

Indirect purchasers may also sue under New York's consumer protection statute when they were targets of the alleged deception. *See Suboxone*, 64 F. Supp. 3d at 702 (upholding end-payor claim where defendants made consumer-facing false statements). *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 165 (E.D. Pa. 2009) does not hold otherwise. The *Wellbutrin* court dismissed New York consumer claims where the defendant made a false statement to the FDA, not to plaintiffs, who never purchased the drug at issue. Here, IPPs and EUPs purchased Defendants' Fragrances Products and goods containing them, and Defendants made deceptive consumer-facing statements. (*See* EC ¶¶ 195-96; IC ¶¶ 170-71.)

### 3.    IPPs Are Proper Plaintiffs under MN, SC, NM, & VT's Statutes.

The consumer protection statues of Minnesota, South Carolina, New Mexico, and Vermont are not limited to natural consumers, as Defendants argue based on a single case citation. MTD at 57. Minnesota's Consumer Fraud Act is "very broadly construed" and "is not expressly limited to individual consumers." *Ly v. Nystrom*,

---

[61] Defendants' outdated authority contradicts or is distinguishable from more recent in-Circuit authority. *See, e.g.*, *In re Suboxone Antitrust Litig.*, 64 F.Supp.3d 665, 701-02 (E.D. Pa. 2014) (plaintiff failed to cite any antitrust authority); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 195 (D. Me. 2004) (contrary to *Generics II*); *In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (same); N.J. Stat. Ann. § 56:9-12(c) (permitting damages suits by indirect purchasers under NJ Antitrust Act).

53

615 N.W.2d 302, 308–10 (Minn. 2000).[62] Likewise, South Carolina and Vermont permit businesses to bring consumer protection claims,[63] as does New Mexico. *See Navajo Nation v. Urban Outfitters, Inc.*, 935 F.Supp.2d 1147, 1173 (D.N.M. 2013) (defining proper plaintiffs under NMUPA "to include corporations and other business entities").[64] Defendants misconstrue *Williams v. Foremost Ins. Co.*,102 F.Supp.3d 1230, 1240 (D.N.M. 2015) which held a plaintiff was a "non-consumer" because she did not transact with the defendant. The case did not overrule NMUPA's express language authorizing suits by "corporations and business entities."

4.    **MT's & SC's Consumer Laws Do Not Bar Federal Class Actions.**

As discussed above, *supra* Section III.E.2, under *Shady Grove,* procedural limitations on class actions in state court do not preclude class actions in federal

---

[62] *See also Securian Financial Group, Inc. v. Wells Fargo Bank, N.A.*, 2014 WL 6911100, at *6 (D. Minn. Dec. 8, 2014) (finding that the Minnesota Supreme Court had not prohibited "merchants" from bringing consumer protection claims and that Minnesota courts have allowed merchants to pursue such claims).

[63] *McTeer v. Provident Life & Accident Ins.*, 712 F. Supp. 512, 515 (D.S.C. 1989) ("[T]he South Carolina UTPA also includes transactions between businesses or commercial entities such as the parties to these actions…the fact that the parties' transaction is not a consumer transaction does not prevent it from giving rise to a UTPA claim."); *Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 965 A.2d 460, 467 (Vt. 2008) ("[T]he Act applies to businesses in general.").

[64] *See also Quynh Truong v. Allstate Ins. Co.*, 227 P.3d 73, 81 (N.M. 2010) (finding that the NMUPA is remedial legislation and should be interpreted liberally).

54

court under Rule 23. *See* 559 U.S. at 398, 406-10. [65] Accordingly, federal courts permit class actions based on Montana and South Carolina's consumer protection claims. *See In re Mercedes-Benz Emissions Litig.*, 2019 WL 413541, at *26 (D.N.J. Feb. 1, 2019) (holding Rule 23 permits class actions asserting Montana and South Carolina consumer protection claims), *vac'd on other grounds* 797 Fed. Appx. 695 (3rd Cir. 2020); *Cohen v. Subaru of Am., Inc.*, 2022 WL 721307, at *29 (D.N.J. Mar. 10, 2022) (same for South Carolina statute); *Hill v. LLR, Inc.*, 2019 WL 2404900, at *10-11 (D. Mont. Mar. 8, 2019) (same for Montana statute).

### 5. EUPs and IPPs Properly Allege Deception in MN, NY, PA, & WI.

As set forth in Section III.B, allegations of deceptive conduct involving trade associations (EC ¶¶ 142-158; IC ¶¶ 119-134), the timing and sizes of coordinated price increases (EC ¶¶ 159-192; IC ¶¶ 135-167), and agreement to restrain supply (EC ¶¶ 210-217; IC ¶¶ 185-194) satisfy the consumer protection laws of Minnesota, New York, Pennsylvania, and Wisconsin. [66] *See In re Vascepa Antitrust Litig. Indirect Purchaser Pls.*, 2023 WL 2182046, at *9 (D.N.J. Feb. 23, 2023) (upholding Minnesota and New York claims where defendant allegedly "deceived the public,

---

[65] Given that Rule 23 "addresses not the remedy, but the procedural right to maintain a class action," *Shady Grove*, 559 U.S. at 401 n.4, it is procedural, thus superseding state law restrictions.

[66] EUPs specifically allege reliance by Pennsylvania Plaintiff Alex Greenzweig and members of the Damages class in purchasing products containing fragrance ingredients. (EC ¶ 316.)

its investors, and consumers by both misrepresentation and/or by withholding material information"); *Generics II*, 368 F. Supp. 3d at 845-46 (upholding Minnesota, New York, and Wisconsin claims based on similar allegations); *Suboxone*, 64 F. Supp. 3d at 701-03 (similar, sustaining claims under Minnesota and Pennsylvania law); *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 421 (E.D. Pa. 2010) ("*Sheet Metal Workers*") (similar under Pennsylvania's law).[67]

### 6.    AR, PA, and NM's Laws Encompass Anticompetitive Conduct.

Arkansas and Pennsylvania's consumer protection laws are both construed liberally and encompass the anticompetitive conduct that EUPs and IPPs allege. *See, e.g., Sheet Metal Workers*, 737 F. Supp. 2d at 404-05, 421 (holding antitrust-based

---

[67] Defendants' authority is distinguishable. *See, e.g.*, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 190 (D. Me. 2004) (plaintiffs made no allegations of deception or omission); *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 909 (E.D. Pa. 2012) (similar, where plaintiffs failed to allege that the deceptive price-fixing scheme caused their injuries); *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 2023 WL 9004806, at *36 (M.D. Tenn. Dec. 28, 2023) (declining to consider case law that permits antitrust claims under Pennsylvania's consumer protection law); *Mueller v. Harry Kaufmann Motorcars, Inc.*, 859 N.W.2d 451, 457 (Wis. Ct. App. 2014) (no reference to antitrust or price-fixing allegations). Also misplaced is Defendants' reliance on *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 795 F. Supp. 2d 874, 879 (D. Minn. 2011), as Rule 9(b) does not apply to consumer protection claims based on the alleged unconscionable or deceptive business practices. *See Generics II*, 368 F. Supp. 3d at 846.

claims satisfy Arkansas and Pennsylvania's consumer-protection statutes); *Chocolate*, 602 F. Supp. 2d at 583 (same for Arkansas statute).[68]

EUPs and IPPs' price-fixing allegations also satisfy New Mexico's consumer protection statute (the "NMUPA"), which prohibits conduct that "results in a gross disparity" in price. *See In Re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1082 (S.D. Cal. 2017) (upholding NMUPA claims based on price-fixing allegations); *TFT-LCD*, 586 F. Supp. 2d at 1127 (same); *Chocolate*, 602 F. Supp. 2d at 586 (same); *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *25 (Jun. 6, 2013) (same).[69] Here, EUPs and IPPs allege Defendants' price-fixing substantially affected New Mexico commerce (EC ¶ 313(b); IC ¶ 298(b)), satisfying the NMUPA.

---

[68] Defendants' authority is unpersuasive. The court in *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166-67 (N.D. Cal. 2015) specifically declined to follow the "broad definition of unconscionability adopted by the Arkansas Supreme Court." The court in *In re K-Dur Antitrust Litig.,* 2008 WL 2660780, at *4 (D.N.J. Feb. 28, 2008) dealt with a claim for unjust enrichment, not consumer fraud, and was not followed on that point by more recent authority within the Third Circuit.

[69] Defendants' cited authority has been explicitly rejected. *See Domestic Drywall Antitrust Litig.*, 2016 WL 3769680, at *10 (E.D. Pa. Jul. 13, 2016) (noting that *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) "rests on a misunderstanding of the statute itself"). Unlike here, the plaintiffs in *Hard Disk Drive*, 2021 WL 4306018, at *14 did not allege a substantial impact on prices.

**7.    EUPs and IPPs Allege Intrastate Effects in FL, IL, MA, and NY.**

EUPs and IPPs specifically allege that Defendants' price-fixing affected commerce and caused injury in Florida, Illinois, Massachusetts, and New York.[70] This is more than sufficient to show an intrastate nexus under each state's laws. *See, Liquid Aluminum Sulfate*, 2017 WL 3131977, at *24, n.25-26 (collecting cases holding that interstate price-fixing allegations are a sufficient intrastate nexus under New York and Massachusetts's consumer protection laws); *Generics II*, 368 F.3d at 844-45 (same for New York and Florida).[71]

**8.    EUPs State a Claim under Nevada Law.**

EUPs sufficiently allege a claim under the Nevada Deceptive Trade Practices Act (the "NDTPA"), Nev. Rev. Stat. §§ 598.0903-.0999. The NDTPA allows "any person" who has been a victim of a deceptive trade practice to bring an action. Nev.

---

[70] EC ¶ 303(e)-(f) ("Defendants' unlawful conduct had the following effects […] *throughout Florida* […] and stabilized at artificially high levels *throughout Florida*", which had "a substantial effect *on Florida commerce and consumers*.") (emphasis added); IC ¶ 295(b) (Florida); EC ¶ 305(b) and IC ¶ 296(b) (Illinois); EC ¶ 306(b)-(d) (Massachusetts); EC ¶ 314(a)-(d) (New York).

[71] Defendants' cases are distinguishable because those plaintiffs did not allege in-state deception or price-fixing claims. *See, e.g.*, *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 214 (E.D. Pa. 2009) ("no allegation that any deceptive conduct took place in New York"); *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853-54 (Ill. 2005) (discussing whether non-Illinois plaintiffs' claims under the Illinois consumer fraud act violated the extraterritorial application of Illinois law. The "primarily and substantially" language Defendants cherry picked appears nowhere in Illinois' Consumer Fraud Act).

Rev. Stat. § 41.600(1). *See Generics II*, 368 F. Supp. 3d at 847-48, n.156 (permitting Nevada indirect purchasers' consumer protection violation to continue); *Packaged Seafood*, 242 F. Supp. 3d at 1080-81 (same).[72]

## G.   EUPs' AND IPPs' CLAIMS SATISFY STATE UNJUST ENRICHMENT LAWS.[73]

### 1.   EUPs' Unjust Enrichment Claims Are Properly Plead.

Contrary to what Defendants argue (MTD at 54), EUPs are not required to plead separate unjust enrichment claims because it is "premature to consider [unjust enrichment's] requirements on a state-by-state basis" at the pleading stage. *See Hypodermic Prods.*, 2007 WL 1959225, at *16. State-specific "identification is not necessary at the pleading stage because the elements of unjust enrichment are similar in every state." *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 729-30 (S.D.N.Y. 2017) (cleaned up). Moreover, EUPs' unjust enrichment claims "incorporate by reference" (¶ 319), and thus identify, the thirty-three states whose

---

[72] Defendants' reliance on *Chocolate Confectionary* is misplaced, as that court failed to recognize that the NDTPA does not limit recovery to elderly or disabled persons, but provides additional awards to such persons. *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, at 226-27 (S.D.N.Y. 2012) ("while any victim of consumer fraud may bring a civil action, elderly and disabled persons may recover more for each violation").

[73] Defendants improperly fail to individually analyze the states' laws. *See Flash Memory*, 643 F. Supp. 2d at 1163 ("Instead of analyzing the laws of each state separately, Defendants relegate their discussion to a string cite contained in a footnote in their moving papers. The lack of individualized analysis by the parties is unhelpful…. they should [have discussed] the laws of each state separately.").

unjust enrichment laws should be applied. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 2015 WL 3988488, at \*20 (N.D. Ill. June 29, 2015) (applying unjust enrichment laws of eight states referenced in complaint where unjust enrichment count did not specify states).

### 2. Antitrust Claims Do Not Preclude Unjust Enrichment.

Defendants seek to dismiss unjust enrichment claims in several states on the grounds that "adequate" remedies at law are available. (MTD at 63.) But parties generally "need not demonstrate the inadequacy of available remedies at law" to seek unjust enrichment. *Restatement (Third) of Restitution and Unjust Enrichment* § 4(2) (2011). Even in states that hold otherwise, "it has long been recognized that" Fed. R. Civ. P. 8 allows IPPs and EUPs to plead unjust enrichment in the alternative, preventing any dismissal at the pleading stage.[74] *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 702 F.Supp.2d 514, 540 (E.D. Pa. 2010).

Defendants also argue that antitrust remedies are exclusive in twelve states. (MTD at 63.) Defendants are wrong.[75] Absent a "clear command" that antitrust

---

[74] *See also In re Pork Antitrust Litig.,* 495 F. Supp. 3d 753, 799 (D. Minn. 2020) (same); *Flonase*, 692 F. Supp. 2d at 543 (same); *K-Dur*, 338 F. Supp.2d at 544 (same); *Hypodermic Prods.*, 2007 WL 1959225, at \*16 (same); *Chocolate*, 749 F. Supp. 2d at 240 (same); *In re G-Fees*, 584 F. Supp. 2d 26, 46 (D.D.C. 2008) (same).

[75] Defendants cite a single out-of-circuit Special Master's report and recommendation, which misconstrued the absence of an express unjust-enrichment provision as an exclusion of unjust enrichment. *See Miller v. French*, 530 U.S. 327, 340-41 (2000) (stating courts "should not construe a statute to displace courts'

remedies are exclusive, which Defendants cannot show, unjust enrichment may be sought alongside antitrust claims under these states' laws. *See, e.g.*, *In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, 2022 WL 736250, at *23 (D. Del. Mar. 11, 2022) (permitting unjust enrichment alongside state antitrust claims, finding no "clear command" that antitrust remedies are exclusive).[76]

### 3. IPPs Need Not Confer a Direct Benefit on Defendants.

Defendants next argue that unjust enrichment claims in six states should be dismissed because IPPs did not confer a "direct" benefit upon Defendants. (MTD at 64.) Defendants misstate the law, which does not require direct privity; only that the plaintiffs' "detriment and the defendant's benefit are related and flow from the challenged conduct." *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000). Accordingly, all six states permit unjust enrichment even where there is no direct privity between the plaintiff and defendant.[77]

---

traditional equitable authority absent the clearest command, or an inescapable inference to the contrary….") (internal citations omitted).

[76] *See also State ex rel. Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 495–98 (Minn. 1996) (permitting unjust enrichment claim under Minnesota law); *Davis v. ING Financial Advisers, LLC*, 2006 WL 8454341, at *4 (S.D. Miss. Apr. 26, 2006) (same under Mississippi law); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40–41 (N.Y. App. Div. 1st Dept. 2004) (same under New York law); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) (same under Tennessee and Vermont law).

[77] *Brown v. Pinnacle Restoration LLC,* 2013 WL 3148654, at *2–3 (Ariz. Ct. App. June 18, 2013) (Arizona); *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 899 So. 2d 1222, 1227-27 (Fla. 1st DCA 2005) (Florida); *In re Auto. Parts Antitrust*

### 4. FL, IL, MO, and SC Allow IPPs to Seek Unjust Enrichment.

Florida, Illinois, Missouri, and South Carolina's adherence to *Illinois Brick* does not bar indirect purchasers from bringing unjust enrichment claims under state common law, as Defendants argue (MTD at 64-65). *See Generics II*, 368 F. Supp. 3d at 850 ("[A] state's adherence to the rule of *Illinois Brick* . . . [does not dispossess the] right to pursue a common law [unjust enrichment] remedy."); *G-Fees,* 584 F. Supp. 2d at 46 (same); *Cardizem*, 105 F. Supp. 2d at 669-71 (similar). To the contrary, courts routinely permit indirect purchasers to seek unjust enrichment in non-repealer states, including the four challenged here.[78]

### 5. Unjust Enrichment Is a Recognized Claim in CA and MS.

Unjust enrichment is a cognizable claim in both California and Mississippi. *See Ghirardo v. Antonioli*, 924 P.2d 996, 1002, 1005 (Cal. 1996) (holding plaintiffs are "entitled to seek relief under traditional equitable principles of unjust enrichment."); *Koval v. Koval*, 576 So. 2d 134, 136-37 (Miss. 1991) (permitting recovery "under the theory of unjust enrichment"). Accordingly, federal courts

---

*Litig.*, 29 F. Supp. 3d at 1020; *Everest v. Leviton Mfg. Co.*, 2006 WL 381832, at *4 (Me. Super. Jan. 13, 2006) (Maine); *Kammer Asphalt Paving Co., Inc. v. E. China Twp. Sch.*, 504 N.W.2d 635, 640–41 (Mich. 1993) (Michigan); *DDAVP*, 903 F. Supp. 2d at 234 (New York); *Pork*, 495 F. Supp. 3d at 796 (North Dakota).

[78] *In re Auto. Parts Antitrust Litig.*, 2015 WL 10376960, at *8 (E.D. Mich. Dec. 30, 2015) (South Carolina); *In re Opana ER Antitrust Litig.*, 2016 WL 4245516, at *2, *4 (N.D. Ill. Aug. 11, 2016) (Florida, Missouri); *Cardizem*, 105 F. Supp. 2d at 668–71 (Illinois).

permit unjust enrichment claims under California and Mississippi law. *See, e.g.*, *Sensipar*, 2022 WL 736250, at \*24 (California); *Processed Egg Prods.*, 851 F. Supp. 2d at 913 (California and Mississippi); *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 196 (D. Me. 2010) (Mississippi).

### 6.    In WI, Unjust Enrichment Encompasses Antitrust Overcharges.

Citing a single false advertising case, Defendants argue that Wisconsin bars unjust enrichment claims based on "product purchases." MTD at 65. Not so. Purchasing products at supercompetitive prices "satisf[ies] the elements of an unjust enrichment claim under Wisconsin law" because "Defendants received a supra-competitive benefit, not the fair value of the benefit" based on the alleged overcharge. *Auto. Parts*, 29 F. Supp. 3d at 1028–29.

## IV.    <u>CONCLUSION</u>

Because Plaintiffs adequately plead a price-fixing conspiracy under Section 1 of the Sherman Act, the Court should deny Defendants' Motion to Dismiss. To the extent the Court disagrees, Plaintiffs respectfully request leave to amend.

Dated: June 7, 2024                    Respectfully Submitted,

/s/ James E. Cecchi
James E. Cecchi
**CARELLA, BRYNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, NJ 07068

Tel.: (973) 994-1700
jcecchi@carellabyrne.com

*Interim Liaison Counsel for Direct Purchaser Class*

Hilary Scherrer
**HAUSFELD LLP**
888 16th Street NW, Suite 300
Washington, DC 20006
Tel.: (202) 540-7200
hscherrer@hausfeld.com

Christopher M. Burke
**KOREIN TILLERY P.C.**
401 West A Street, Suite 1430
San Diego, CA 92101
Tel.: (619) 6225-5620
cburke@koreintillery.com

Linda P. Nussbaum
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas
31st Floor
New York, NY 10036
Tel.: (917) 438-9189
lnussbaum@nussbaumpc.com

*Interim Co-Lead Class Counsel for the Direct Purchaser Plaintiffs*

/s/ Joseph J. DePalma
Joseph J. DePalma
Catherine B. Derenze
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel.: (973) 623-3000
Fax: (973) 623-0858

64

jdepalma@litedepalma.com
cderenze@litedepalma.com

Mindee J. Reuben
Steven J. Greenfogel
**LITE DEPALMA GREENBERG
& AFANADOR, LLC**
1515 Market Street - Suite 1200
Philadelphia, PA 19102
Tel: (267) 519-8306
MJR Direct Dial: (215) 704-2525
Fax: (973) 623-0858
mreuben@litedepalma.com
sgreenfogel@litedepalma.com

*Interim Liaison Counsel for Producer
Indirect Purchaser Plaintiffs*

Michael J. Flannery
**CUNEO, GILBERT &
LADUCA, LLP**
Two City Place Drive
St. Louis, MO 63141
Tel: (314) 226-1015
mflannery@cuneolaw.com

Evelyn Riley
Daniel Cohen
Lissa Morgans
Cody McCracken
**CUNEO, GILBERT &
LADUCA, LLP**
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Tel.: (202) 789-3960
evelyn@cuneolaw.com
danielc@cuneolaw.com
lmorgans@cuneolaw.com
cmccracken@cuneolaw.com

65

Michelle J. Looby
Daniel E. Gustafson
Daniel C. Hedlund
Frances Mahoney Mosedale
Bailey Twyman-Metzger
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402

Tel: (612) 333-8844
Fax: (612) 339-6622
mlooby@gustafsongluek.com
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
fmahoneymosedale@gustafsongluek.
com
btwymanmetzger@gustafsongluek.co
m

Dennis J. Stewart
**GUSTAFSON GLUEK PLLC**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 595-3299
Fax: (612) 339-6622
dstewart@gustafsongluek.com

*Interim Co-Lead Class Counsel for
Producer Indirect Purchaser
Plaintiffs*

Jon A. Tostrud
Anthony M. Carter
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Tel.: (310) 278-2600
Fax: (310) 278-2640

66

jtostrud@tostrudlaw.com
acarter@tostrudlaw.com

Timothy D. Battin
Christopher V. Le
**BOIESBATTIN LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel.: (703) 764-8700
Fax: (703) 764-8704
tbattin@boiesbattin.com
cle@boiesbattin.com

*Interim Producer Indirect Purchaser Plaintiffs' Steering Committee*

By: */s/ Michael D. Fitzgerald*
Michael D. Fitzgerald
**LAW OFFICES OF MICHAEL D. FITZGERALD**
1 Industrial Way West, Unit B
Eatontown, NJ 07724
P.O. Box 1067
Oakhurst, NJ 07755
(202) 349-1482
mdfitz@briellelaw.com

*Interim Liaison Counsel for the End-User Plaintiffs*

Kellie Lerner
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas, Suite 2601
New York, NY 10019
(212) 980-7400
klerner@robinskaplan.com

Kimberly A. Justice (*pro hac vice*)
**FREED KANNER LONDON**

67

**& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
(610) 234-6487
kjustice@fklmlaw.com

*Interim Co-Lead Class Counsel for End-User Plaintiffs*